FILED
06/23/2022
Clerk of the
Appellate Courts

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE AT NASHVILLE
### February 9, 2022 Session Heard at Lipscomb University[1]

## STATE OF TENNESSEE v. VANA MUSTAFA

**Appeal from the Criminal Court for Davidson County**
**No. 2017-A-393      Mark J. Fishburn, Judge**

_____

### No. M2020-01060-CCA-R3-CD

_____

Defendant, Vana Mustafa, was convicted by a jury of first-degree premeditated murder and received a life sentence. On appeal, Defendant argues that: the evidence was insufficient to support his conviction; the trial court failed to fully charge the jury as to the law concerning self-defense; the trial court erred by requiring him to provide his list of witness's statements to the State at the close of the State's proof; that he was denied the constitutional right to present a defense because the trial court excluded testimony by his expert witness; the trial court erred by excluding his expert witness from the courtroom during trial; the trial court erred by limiting impeachment of a State's witness; the trial court erred in failing to grant a mistrial; he should be granted a new trial based on newly discovered evidence; his life sentence is unconstitutional; he received ineffective assistance of counsel at trial; and he is entitled to a new trial because the cumulative effect of errors denied him a fair trial. Following our review of the entire record, oral argument, and the parties' briefs, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

JILL BARTEE AYERS, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and TIMOTHY L. EASTER, J., joined.

David L. Raybin, Nashville, Tennessee (at motion for new trial), Jonathan Turner, Franklin, Tennessee (at trial), for the appellant, Vana Mustafa.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Janice Norman, Assistant District Attorney General, for the appellee, State of Tennessee.

_____

[1] Oral argument in this case was heard before students in the Fred D. Gray Institute for Law, Justice and Society on the campus of Lipscomb University, Nashville, TN.

# OPINION

This case arises from the shooting death of the unarmed victim, Aiad Malo, during an altercation that occurred during a drug transaction in a vacant parking lot. A Davidson County grand jury indicted Defendant for first-degree premeditated murder, first-degree felony murder, attempted first-degree murder, and employing a firearm during the commission of a dangerous felony. Before trial, the State entered a nolle prosequi for all charges except first-degree premeditated murder and proceeded to trial on that charge.

# BACKGROUND

*State's Proof*

Shortly before 8:00 p.m. on April 1, 2016, Officer David Hughes of the Metropolitan Nashville Police Department ("MNPD") responded to a shoplifting call at the Walmart on Nolensville Road. As he was walking toward the entrance of the store, Officer Hughes heard multiple gunshots fired in rapid succession. He immediately returned to his patrol car and reported the gunshots to dispatch. Officer Hughes spoke to an individual at a car wash who told Officer Hughes what he had observed. Officer Hughes then drove to the parking lot of the former Kmart located at the intersection of Nolensville Road and Harding Place. He discovered several shell casings in the parking lot and large pool of blood with several smaller pools scattered about. Officer Hughes immediately notified dispatch concerning a possible crime scene, and he secured the area.

Sergeant James Williams of the MNPD testified that upon hearing Officer Hughes' radio transmission, he immediately drove to nearby Southern Hills Hospital to see if any gunshot victims had been taken there. He learned that the victim, Aiad Malo, was dropped off at the emergency room, and he spoke with two men standing outside the entrance. Officer Williams then located the victim's Honda Accord parked at the hospital, and someone walked up and gave him a key to the vehicle. A hospital security officer gave Sergeant Williams a DVD of the surveillance video from the emergency room.

Kamaran Kucher testified that the victim was his cousin and friend. He also knew Defendant through social media for approximately four years, and noted that Defendant had been his aunt's neighbor at some point, and he had seen Defendant while visiting his aunt. Mr. Kucher testified that Defendant and the victim "were friends for a long time, very long time, as they were kids," and he had seen them together.

Mr. Kucher saw the victim and Reybaz Abdullah at the barbershop on Nolensville Road on April 1, 2016, and they all went for a drive in the victim's car. Mr. Kucher was driving, the victim was sitting in the front passenger seat, and Mr. Abdullah was sitting in the back. Mr. Kucher estimated that sometime between 6:00 to 7:00 p.m., Mr. Abdullah received a call from Hadar Sindi who wanted to buy some marijuana from him. They

agreed to meet in the Kmart parking lot to complete the transaction. Mr. Kucher drove to the parking lot and parked facing the car wash.

A black Infiniti G-35 with tinted windows pulled up approximately five to ten minutes later and parked next to the victim's car. Mr. Kucher testified that Ms. Sindi got out of the car and walked up to Mr. Abdullah's window and completed the drug transaction. At that point, the victim and Defendant saw one another and began arguing and cursing. The victim got out of his car and walked toward the front of the vehicle. Defendant got out of the Infiniti and walked toward the front of victim's car. Mr. Kucher heard the victim say, "What, are you gonna shoot me?" He then saw a gun in Defendant's hand. Mr. Kucher testified that the victim hit Defendant in the face, and Defendant took two steps back and began shooting at the victim. He thought that Defendant fired six shots. Mr. Kucher noted that the victim attempted to "turn his body, then he dropped after [. . . ] [Defendant] was done shooting." Mr. Kucher testified that Defendant stared at him and then got back into the Infiniti with Ms. Sindi, and they drove away. Mr. Kucher and Mr. Abdullah then got out of the victim's car and retrieved the victim, who was bleeding but still breathing, and placed him in the passenger seat of the car and drove him to Southern Hills Hospital. Mr. Kucher later went to the police station and spoke with detectives. He did not inform them of Ms. Sindi's call to Mr. Abdullah about buying marijuana and said that they were in the Kmart parking lot sitting in the car and "[j]ust chillin' there." Mr. Kucher testified that he did not tell detectives about the drug deal because Mr. Abdullah was afraid that he would get in trouble. He also did not think the drug deal was "important at all to what happened."

Reybaz Abdullah testified that he and the victim were close friends, and he knew Defendant's name and had seen him "around." He was not aware of any problems between the victim and Defendant. Mr. Abdullah's testimony concerning the circumstances leading up to the shooting was similar to that of Mr. Kutcher. He said that the victim and Defendant began "smack" talking when they saw each other in the parking lot, and saying things like: "What are you gonna do?" or "What's up, things like that." Mr. Abdullah testified that Defendant then got out of the Infiniti, and Mr. Abdullah and Mr. Kucher unsuccessfully attempted to prevent the victim from exiting his car. Mr. Abdullah testified:

> They're both walking up at the same time, and [Defendant] has a gun in his hand and [the victim] says "what, are you gonna do, shoot me?" And then he smirks, [Defendant] smirks or whatever it was, and puts it back, I don't know if he had it in his hand or in his waist, I'm not sure, it was dark. And they say something to each other, and [the victim is] like 5'3" and [Defendant is] about maybe 6 something, and he said something back to him, and then after he like swings on him, I'm not sure if he hit him or not because it was dark at the moment. [Defendant] takes two steps back and then starts shooting.

Mr. Abdullah thought that Defendant fired six shots "all at once." He said that the victim jumped in the air to avoid the first few shots. Mr. Abdullah testified that Defendant got back into the car after the shooting and told Ms. Sindi "to go on and drive and leave[.]" Mr. Abdullah initially thought that the victim had only been shot once in the arm, and he and Mr. Kucher picked the victim up, placed him in the car, and drove him to the hospital. Mr. Abdullah spoke with police later but did not tell them about the marijuana because he was scared and did not believe it was important to what happened in the parking lot. He did not know that Defendant would be accompanying Ms. Sindi to the parking lot because she did not mention it when they initially talked on the phone. Mr. Abdullah identified Defendant from a photographic line up that police showed him.

On cross-examination, Mr. Abdullah testified that he sold approximately three grams of marijuana to Ms. Sindi. He agreed that Mr. Kucher was aware that he was going to sell drugs to Ms. Sindi when Mr. Kucher drove him and the victim to the parking lot. Mr. Abdullah clarified that Defendant exited the car with a gun in his hand but then put it away at some point. He said that the victim continued to walk toward Defendant despite Defendant having a gun. He agreed that Defendant never threatened to shoot or kill the victim.

At trial, Mr. Abdullah was not sure whether the victim actually hit Defendant when he swung at Defendant; however, at Defendant's juvenile transfer hearing, he testified that the victim hit Defendant in the face. Mr. Abdullah also testified at the transfer hearing that Defendant was defending himself. He agreed that he told Detective Brittany Shoesmith several times that the victim missed Defendant when he swung at him. Mr. Abdullah said he never told police that Defendant initially had a gun in his hand because they did not ask him that question. He agreed that he told police that the victim got out of the car, attempted to hit Defendant and missed, and Defendant shot the victim.

Officer Warren Fleak of the MNPD Crime Scene Investigations Unit responded to the scene and completed a diagram of the parking lot and location of the evidence. Officer Fleak collected five "Federal" brand .40 caliber shell casings from the scene, and measurements were taken from each shell casing to a fixed reference point. On cross-examination, Officer Fleak testified that the distances between the shell casings were not taken, and there were no measurements taken of the bloodstains in the parking lot or from the shell casings to the bloodstains.

Sergeant Andrew Injaychock of the MNPD, Investigations Unit at the Midtown Hill Precinct, testified that on April 1, 2016, after 10:00 p.m., he was dispatched to the Taco Bell on Powell Avenue where the black Infiniti involved in the shooting had been located. A shell casing was discovered on the trunk lid between the window and the trunk.

Jordan Kerr testified that on April 1, 2016, he was at a car wash across the street from the Kmart parking lot. He said that "[t]wo cars met up and there's five gunshots and

then one car pulled off, and then one car stood there for a little while, and then pulled off a little bit later." He noted that the gunshots occurred in rapid succession. He thought that the car that immediately drove away was black, and the other car was silver.

Hadar Sindi testified that Defendant was her former friend and neighbor. On April 1, 2016, she was at a hookah bar when Defendant sent her a message via Snapchat asking her to pick up him and his girlfriend, Diana Simic. Ms. Sindi drove to Defendant's house in her black Infiniti and picked them up. She asked Defendant where they were going, and Defendant said, "Take me to K[]mart parking lot." She said Defendant indicated that he wanted to see some friends. Ms. Sindi testified that she first drove to Regions Bank and withdrew forty dollars to use later to buy marijuana from Mr. Abdullah and then drove to the Kmart parking lot. She noted that she had talked with Mr. Abdullah earlier that afternoon, but she did not talk with him immediately before driving to the parking lot.

Ms. Sindi pulled into the Kmart parking lot and parked beside the victim's car. She said that the victim and Defendant began talking "window-to-window to each other, and that's when [Defendant] stepped out of the car, and [the victim] stepped out of the car, and they were in each other's faces." Ms. Sindi further testified, "After they both got out the car, they went up to each other and like, like a couple of seconds later, [the victim] punched him and then that's when [Defendant] shot him." She was not certain if the victim actually struck Defendant. Ms. Sindi said that she was inside the car when this occurred and then stepped out of the car as Defendant shot the victim. She had not seen Defendant with a weapon prior to that moment, and she thought that he fired three or four shots at the victim. Ms. Sindi testified:

> At that point, by the time I turned around to get in my car, [Defendant] had already got in my car, and he was like "Start driving." I started driving, and he just kept saying "Keep driving." I kept asking him "Why did you do that?" He was like, "Because I had a beef with him." And I just kept driving. I just found the closest street to get into, I just told him to get out of the car.

Ms. Sindi testified that Defendant seemed angry after the shooting, and she noted that he was "just like shaking and moving and just yelling and screaming." She said that Defendant told her to drive "like at least 50 times," and she told Defendant to get out of the car at least ten times. Ms. Sindi noted that Defendant still had the gun in his hand while in the car, and she was afraid. She said that Defendant finally got out of her car near Paragon Mills, and she dropped his girlfriend off at someone's house. Ms. Sindi called a friend and told him to meet her at the Taco Bell near One Hundred Oaks. She left her car at the restaurant and rode back to the scene at the Kmart parking lot with her friend. Ms. Sindi spoke with police and was taken to the police department for questioning. Ms. Sindi did not tell police about her earlier phone call to Mr. Abdullah about buying marijuana because she "didn't think it had anything to do with that moment."

On cross-examination, Ms. Sindi admitted that she called Mr. Abdullah at approximately 3:00 to 4:00 p.m. on the day of the shooting to buy drugs from him. She said that she did not originally arrange for them to meet in the Kmart parking lot and that she was "supposed to meet him later that night when I was fixin' to be with [Defendant's] sister." Ms. Sindi testified that she did not call Mr. Abdullah after she picked up Defendant, and she never heard Defendant call Mr. Abdullah. When they arrived at the Kmart parking lot, the victim, Mr. Abdullah, and Mr. Kucher were already there. Defendant directed her to pull up beside their car. Ms. Sindi testified that she did not buy any drugs from Mr. Abdullah. She said that she stepped out of her car as the victim swung at Defendant, and Defendant shot the victim. She reiterated that she could not say for certain whether the victim struck Defendant's face when he swung at him. Ms. Sindi testified that she never saw a gun in Defendant's possession before the shooting, and he did not threaten to kill anyone before the shooting.

Diana Simic testified that she and Defendant were friends, and they were at his house on April 1, 2016, when Ms. Sindi arrived and later drove them to the Kmart parking lot. Concerning the shooting, Ms. Simic testified:

> I think [Ms. Sindi] gets out [of] the car, and then she's talking to someone that's in the other car, and then [Defendant] starts arguing with this one guy that was in the other car, and then they both get out [of] the car, and I guess they [were] gonna fight or something, I don't really remember, and someone got shot.

Ms. Simic remembered hearing someone say: "What's up." She put her head down once she heard the gunshots. After the gunshots, Defendant ran back to the car, and Ms. Sindi, who had also gotten back into the car, drove away. Ms. Simic testified:

> He was telling the girl that was driving [Ms. Sindi] to pull off, and we kept asking him "what happened," but he didn't say anything at first until we started driving, then he was like, I'm pretty sure he said "He punched me," and then he saw him reach for something, but I don't remember.

Ms. Simic testified that she did not see Defendant in possession of a gun before the shooting. However, they stopped on the way to Defendant's house, and Defendant tossed the gun "in the grass somewhere." Ms. Simic spoke with detectives the following day and told them that Defendant said, "I shot him. He punched me and he was reaching for something in his pocket." Ms. Simic testified that Ms. Sindi drove her home after she took Defendant home.

- 6 -

On cross-examination, Ms. Simic testified that Ms. Sindi called someone while they were in the car to arrange a drug deal. She did not know who Ms. Sindi called or what time the call was placed. Ms. Simic testified that the other car was already in the parking lot when Ms. Sindi, Ms. Simic, and Defendant arrived. She said that Ms. Sindi got out of the car to buy drugs from someone in the other car. She was "pretty sure" that Ms. Sindi actually bought drugs. At some point, Defendant and the victim began arguing. Ms. Simic testified that both men were behind Ms. Sindi's vehicle when Ms. Simic heard shots fired. She did not know how many individuals were in the other car. Ms. Simic agreed that she told Detective Shoesmith that as soon as they pulled into the parking lot, Defendant said, "oh, is that him, I don't like him, I got a beef with him[.]" She also agreed that Defendant was referring to the victim.

Officer Douglas Belcher, a crime scene investigator with the MNPD photographed and processed the victim's 2004 silver Honda Accord for evidence. There was a bloodstain at the "bottom front edge of the rear passenger door." Officer Belcher located small pieces of a green leafy substance that appeared to be marijuana in the door handle of the rear passenger side door, rear passenger floorboard, and rear passenger seat.

Officer John Terry, a MNPD crime scene investigator, processed different areas related to the shooting that occurred on April 1, 2016. He photographed a vehicle located at the Taco Bell at One Hundred Oaks and recovered a .40 caliber fired cartridge casing located "at the crease between the trunk lid and the rear window." Officer Terry testified that he photographed Mr. Abdullah's and Mr. Kucher's shoes, noting that they both had bloodstains on them. He photographed Ms. Sindi and noted that she had no blood on her shoes. He also photographed Defendant, who had no visible injuries. On cross-examination, Officer Terry testified that he was called back to the scene at the Kmart parking lot to photograph some shoe prints in a pool of blood. He also placed a ruler near some of the shoe prints to show the scale. Several of the prints overlapped each other.

Detective Shoesmith was the lead investigator in the present case. She drove to the Midtown Hills precinct and interviewed Mr. Kucher, Mr. Abdullah, and Ms. Sindi. Detective Shoesmith testified that Mr. Kucher was visibly upset and angry about the death of his cousin. Mr. Kucher provided a statement to Detective Shoesmith's partner, Detective Anthony Chandler, regarding what happened, and he identified Defendant as the person who shot the victim. He also identified Defendant from a photographic lineup.

Detective Shoesmith testified that Mr. Abdullah's demeanor was similar to Mr. Kucher's. She said that he seemed very angry about what happened to the victim. Detective Shoesmith testified that Mr. Abdullah also identified Defendant from a photographic lineup as the shooter.

Detective Shoesmith also interviewed Ms. Sindi, whom she described as surprised by what had happened and "a little bit angry." Ms. Sindi provided some additional

information about Defendant and said that she had known him for a very long time. Detective Shoesmith testified that Ms. Sindi was very cooperative and "walked us through what happened, what she did after the incident occurred, told us where to find her vehicle."

After speaking with Ms. Sindi, Detective Shoesmith was notified that Defendant, or someone speaking on his behalf, had contacted dispatch and indicated that Defendant wanted to provide a statement. Two officers then transported Defendant to the Midtown Hills precinct, and members of Defendant's family also arrived. Defendant was advised of his *Miranda* rights and signed a waiver indicating that he wished to give a statement to detectives. Because he was a minor, Defendant also waived his right to have a parent present during the interview. The video of Defendant's lengthy statement was played for the jury.

In his statement, Defendant said that Ms. Sindi called him and asked if he wanted to smoke some marijuana. He agreed, and Ms. Sindi picked up him and Ms. Simic and drove them to purchase marijuana. Defendant said that he was a former longtime friend of the victim and that he had a "beef" with the victim because of a girl. He said that the victim had also "set him up" and then had someone else "whoop [Defendant's] ass." Defendant claimed that the victim repeatedly taunted him over the incident but had not done anything else. Defendant said that he would not have gone with Ms. Sindi if he had known the victim would also be there. They arrived at the parking lot, and Ms. Sindi rolled her window down to speak to Mr. Abdullah, the driver of the other car, whom Defendant knew by first name. He noted that Mr. Abdullah remained in the car. Defendant thought that there were possibly five people in the other car, but he said, "I know I saw four people for a fact." He told the detectives that during that time, he and the victim saw each other, and he heard Mr. Abdullah say, "oh shit, that's [Defendant]."

Defendant told the detectives that before Ms. Sindi exited her car, he and the victim were insulting each other. The victim exited his car, and Defendant thought that they would fist fight. However, Defendant took his gun with him when he got out of Ms. Sindi's car. He did not trust drug dealers because they were usually armed. He also said that "a lot of m - - - - r f- - - - - s don't like me." Defendant claimed that he approached the victim but then saw someone else exit the victim's car holding a revolver. Defendant said several times that he could not see who the other person was because Defendant was not wearing his glasses; however, he was sure that the other person was not Mr. Abdullah.

Defendant told the detectives that the person with the revolver cocked the hammer, and the victim then "sucker punched" Defendant. He said that he "panicked," and his "first reaction was [he] just pulled [his] gun and [he] just started shooting at him and then the guy with the revolver." Defendant said that he "blacked out" when he started firing his gun. He claimed that the other person with the gun fired one shot at him. Defendant said that he ran away after the shooting and lost his gun while running because he had put it in his gym shorts.

When detectives confronted Defendant about the inconsistencies between his account of what happened and that of the other witnesses, Defendant admitted that he got back into Ms. Sindi's Infiniti after the shooting and told Ms. Sindi to drive him away. Eventually, she ordered him out of the car and sometime later, while on foot, Defendant lost his gun.

Detective Shoesmith testified that Defendant's family members consented for their residence to be searched for the handgun, Defendant's cell phone, and clothing that he may have been wearing at the time of the shooting. Detective Shoesmith contacted Ms. Simic, and she agreed to give a statement. Because Ms. Simic was a minor, her father was also present. Detective Shoesmith then obtained search warrants for both the victim's vehicle and Ms. Sindi's vehicle. She also obtained surveillance video from several different locations around the area of the shooting but "none captured a portion of the incident[.]"

Detective Shoesmith testified that Defendant's iPhone was recovered from his residence. The phone was locked, so no data could be retrieved. Detective Shoesmith conducted a phone interview with Jordan Kerr who was at a car wash across the street at the time of the shooting and had called 911. Detective Shoesmith obtained a video from Regions Bank from the night of the shooting which showed Ms. Sindi driving her black Infiniti with Defendant seated in the passenger's seat, withdrawing money from the ATM. She noted that ATM receipts were also found in Ms. Sindi's car.

On cross-examination, Detective Shoesmith agreed that both Mr. Kucher and Mr. Abdullah failed to disclose that they were involved in a drug transaction at the time of the shooting. She further agreed that Mr. Abdullah claimed that they were in the Kmart parking lot because "the driver had dropped a phone or a phone charger and they pulled over to try to find it."

Detective Anthony Chandler testified that he assisted Detective Shoesmith with the interviews of Defendant and various other witnesses. He spoke with Defendant's mother and brother at the Midtown Hills Precinct, and Defendant's mother gave consent to search her residence where Defendant also lived. Defendant's family told Detective Chandler that Defendant's cell phone was located in one of the bedrooms at the residence. He found the phone and the SIM card, which had been removed, in a dresser drawer and collected the two items. Two additional cell phones were found in Defendant's bedroom along with several items of clothing. Detective Chandler did not find any weapons in the residence.

Detective Chandler testified that Defendant gave two different versions of what happened to the gun used in the shooting. Detective Chandler and two other detectives searched the "general area" where Defendant claimed that he lost the gun while running; however, they did not find anything.

- 9 -

Dr. Thomas Deering, a medical examiner, testified that the victim died as a result of multiple gunshot wounds. He noted that the victim was five feet, three inches tall. Dr. Deering testified that it appeared one of the bullets went through the victim's left arm, through the chest, and into the right arm hitting several "significant structures, particularly the lungs and the aorta" causing a large amount of bleeding. He said that the victim could have been turned to the side when the shot was fired in an attempt to present a smaller target. Dr. Deering also noted that these particular injuries also could have been caused by three separate shots rather than one.

Dr. Deering described the path of a second bullet as starting in the victim's left upper back and travelling from left to right. He further described the path of the bullet as follows:

> The difference between the others is they're fairly level, if the person was standing up. This one would go downward through him, and it also would go from his back to his front, so it has a different way in which it goes through the body, and I'm not gonna go down swinging for that path, it's really the last two wounds that are left.

Ryan Kent, a "firearm and tool mark examiner" with the MNPD Crime Laboratory, examined the six cartridge casings recovered in this case. He determined that they were all fired from the same gun; however, he never received a gun for comparison with the casings. Mr. Kent agreed that the casings had characteristics of being fired from a Glock firearm, but he could not say for certain from what type of gun they were fired.

*Defendant's Proof*

Awaz Mustafa, Defendant's sister, picked Defendant up at approximately 8:00 p.m. on April 1, 2016, and that she noticed a "knot" on his left eye. Ms. Mustafa testified that her mother photographed the injury with her cell phone after Ms. Mustafa and Defendant arrived home.

Ryan Rhodes testified that he was standing in the Arby's parking lot across the road from the Kmart parking lot when he "noticed a commotion in that parking lot where the K[]mart used to be, and there was a silver car facing in one direction and a black Mercedes Benz[2] facing the other direction." Mr. Rhodes said that people were standing outside of the car and appeared to be having an argument. He then heard multiple gunshots and people screaming and "rushing around." Mr. Rhodes further testified: "It looked like somebody had been thrown in the silver car[.]" He called 911 and noted that the silver car left on Harding Drive traveling toward the interstate, and the black Mercedes drove "towards Nolensville Road towards the downtown direction." Mr. Rhodes testified that

---

[2] The car was actually an Infiniti.

neither vehicle traveled toward Southern Hills Hospital. He noted: "there are back roads that you can take to just go straight over to Southern Hills."

On cross-examination, Mr. Rhodes stated that he had just gotten back into town on the day he was contacted by police concerning the shooting and later admitted that he was out of town in treatment for his drug addiction. At that point, defense counsel objected to Mr. Rhodes testimony and requested a mistrial. The trial court denied the request stating:

> I don't think the information is so prejudicial that the jury is necessarily going to throw out his entire testimony. His testimony is really, except for a few things, kind of generally corroborative of what happened on that night, other than direction of the gray car and possibly the number of shots, which he candidly admits he doesn't know how many shots there was.

The trial court then gave the following curative instruction:

> All right, members of the jury, just disregard that last question and answer about his being a recovering drug addict. It isn't relevant to the issues in this case unless he was using drugs on the night that he observed all of this, so just disregard it and don't consider that during the course of your deliberations.

The trial court conducted a jury-out hearing prior to the testimony of Defendant's expert witness, Johnny Lawrence, a private investigator. Mr. Lawrence was a former police detective who testified that he had worked more than 700 homicides. He said that his training came from "schools, classes, and conferences, and self-taught and on-the-job training." Mr. Lawrence noted that he had testified as an expert "numerous times," once in bloodstains and bloodstain "interpretation" and twelve other times in "crime scene interpretation, which is different from analysis[,] [c]rime scene investigations, crime scene reconstruction, those type." Through Mr. Lawrence, Defendant sought to introduce proof regarding the distances between shell casings and various bloodstains at the crime scene.

Mr. Lawrence testified that he reviewed photographs in this case and enhanced some of them. He identified various items in the photographs and explained how he estimated the locations and distances for items in the photographs. Mr. Lawrence noted that he was

> asked to see if I could put the vehicles back and see if I could put it together. One vehicle, there's no way I can work it, the shell casings doesn't really tell me anything because you don't know where they're gonna bounce. I do know one casing ended up on the back of a vehicle, and it either had to be put there or it had to be ejected from the gun to the location.

- 11 -

Mr. Lawrence prepared some diagrams of the crime scene based on his "findings, not of anything from the case." He noted that he could not say exactly where the Infiniti was located at the scene, "so it was in that general area" in the diagram. He said, "The Honda is pretty close to its original position because of the bloodstains where they put the victim in the car." Mr. Lawrence testified that the only thing left at the scene when police arrived were the five shell casings and what appeared to be bloodstains.

Mr. Lawrence further testified:

> I cannot put the Infiniti back, there's no way possible. The casings itself, I don't know if they got run over or what, I cannot really testify to anything about the cases, because once a shell casing hits a hard surface, it's gonna bounce, you don't know which direction it's going, so the casings are irrelevant to as to where everything else is.

Mr. Lawrence could only give a general location of the shooter and could not "put him in a position." He further testified: "All I can say is the very bottom red bloodstain is the first sign of blood I saw in the picture, that's the first location of blood," and "[a]s far as where people were when it happened, I cannot put them back." Mr. Lawrence estimated that there was a distance of somewhere between thirty-five to forty feet from the first shoe print to the right of the bloodstain to the next bloodstain. He used the shoe print and a ruler to determine the length between the stains.

On cross-examination, Mr. Lawrence agreed that no tests were done on any of the stains in the parking lot to determine if they were blood. He also agreed that he was not a shoe print expert and that there were multiple prints in one stain. However, he believed that he could identify one shoe print which had a scale placed next to it in the photograph. Mr. Lawrence used a ruler on his computer screen to determine that the scale was four millimeters long, and he extrapolated that measurement to determine the distances between the various bloodstains. Mr. Lawrence agreed that since no DNA testing was done, he did not know if the shoe print was actually left in blood. He also agreed that "he had no scientific way to determine that your four millimeters equals up to a scale in a larger photo." He said, "that's why it's not exact, it's approximate."

Mr. Lawrence agreed that he did not have any scientific or reliable system in which to make any measurements. The following exchange took place between the prosecutor and Mr. Lawrence:

> [Prosecutor]:     You don't have - - there is no explanation to the Judge's question of how did you take this scale and get it to four millimeters, that is not something scientific, is that your guesstimate?

[Mr. Lawrence]:                        Exactly, that's what I put in my report.  It's an approximate.

Mr. Lawrence acknowledged that the MNPD used a F.A.R.O.[3] scanner in every homicide case, and he did not have time to request the F.A.R.O. scan in this case.  He said that a F.A.R.O. scan was not necessarily the best evidence of distance in this case because it was dark at the crime scene, and he did not know where the F.A.R.O. scanner was set up.  Mr. Lawrence agreed that he took the crime scene photos and enlarged them to determine that there were "possibly" other bloodstains.  He agreed that some of the stains looked like "black marks on pavement."

Upon questioning by the trial court, Mr. Lawrence agreed that he could not "tell th[e] jury anything about where the shooter was or where the person who was shot was standing in relation to [the] bloodstains[,]" or the location of either person when the bullets entered the victim's body.  Mr. Lawrence further testified:

> Same way with the Infiniti.  All I can say is, this was the first stain from the picture that I observed where it started.  Where it started, I don't know, but this is what the position, I had nothing to base anything on before that.  This could have been the first drop, it could have been the tenth, I don't know, never will know, but I do know once this started, you had a continuous trail going over to where the shoe impressions was where he got into the car.

Mr. Lawrence agreed that the victim could have walked the distance to where the blood started dripping after he was shot.  Based on the bloodstains, he could determine that there was a continuous trail of blood going over to shoe impressions from more than one person.  Mr. Lawrence believed the bloodstains showed that the victim was placed into the car after he was shot.

Concerning Mr. Lawrence's measurements of the crime scene, the following exchange took place:

> THE COURT:                I'm not suggesting that you're altering anything.  I'm totally at a loss to how you convert this measurement that you use from the photograph with a six-inch ruler to four millimeters.  I don't understand one bit of how you made that conversion.  What is the scientific methodology that is used to make that conversion for measurement purposes?

---

[3] A F.A.R.O. scanner, as explained in further detail elsewhere in this opinion, is a 3D laser scanner used by law enforcement to scan or photograph crime scenes.

- 13 -

[Mr. Lawrence]:         It's not scientific, sir.

THE COURT:             Okay, that's all I needed to know.

Mr. Lawrence then gave further testimony as to how he determined the measurements. The trial court asked: "I want an explanation of how you convert it from a foot to [ ] four millimeters. What is the scientific methodology that is used make that conversion?" To which Mr. Lawrence again replied: "It's not scientific, sir."

The trial court concluded that any measurements based on Mr. Lawrence's computer screen and the crime scene photos were not scientific, as Mr. Lawrence admitted. The trial court pointed out that all of the other witnesses had already testified "where basically the general area he was when he was shot, and . . . everybody agrees that he was taken over to the passenger's side of the vehicle and placed in the car." The court further said: "There's nothing that he is going to testify to that is different than what has already been testified to because I'm not allowing the measurements in." The trial court ultimately allowed Mr. Lawrence to testify as a blood spatter expert.

After the jury returned, Mr. Lawrence reviewed the crime scene photographs and identified at least four different areas of blood in the parking lot. He testified that it appeared someone had walked through one large pool of blood, and there were marks on the pavement indicating that someone had been dragged. He could not make "a determination on directionality" of the bloodstains, other than the drag marks. Mr. Lawrence testified that he did not know the distance between the bloodstains because police did not measure those distances.

*Motion for New Trial Hearing*

Sergeant Kirk Reddick was the crime scene supervisor in this case and took two F.A.R.O. scans or photographs of the scene. He explained that a "F.A.R.O. scanner is a laser 3D scanner. It does three hundred and sixty degrees. It basically shoots out the laser beam, if you will, and then brings back millions of points of distance and records it on the scanner on an S.D. card." Sergeant Reddick testified that the scans had scales assigned to them, and a four-foot steel yard stick was used as a scale during the scans in this case. Another officer also photographed the bloodstains.

Sergeant Reddick testified that the images taken during the F.A.R.O. scans had to be downloaded onto a laptop and processed. He said: "The computer - - the laptop will actually process and put it together. If it does not go together correctly, it will, what we call, cluster." He made a notation in his report that he "completed two scans with the F.A.R.O. 3D imaging system at the scene."

The parties stipulated at the motion for new trial hearing that the images from the F.A.R.O. scans were not initially processed, and at the request of new defense counsel, the State sent a request on April 29, 2019, to "Charles [Linville] at the Metro Nashville Police Department requesting that he prepare the F.A.R.O. scan[s] in the homicide case." The State was provided a copy of the processed images and later provided them to defense counsel prior to the motion for new trial hearing. Sergeant Reddick agreed that no one from the State or the defense contacted him prior to Defendant's trial in 2017 about providing the F.A.R.O. scans to them. He further agreed that it was MNPD policy "they do not create that viewable scan unless a specific request is made[.]"

Sergeant Reddick testified that he does not measure distances between every single item in a crime scene. He said that the F.A.R.O. scans in this case showed the five evidence markers for the shell casings, and he did not "really pay that much attention to where the blood was." He noted that a "rough-sketch diagram" was also completed of the crime scene. Scales were used next to footprints and the bloodstains to show size, but no scales were used to measure the distances between the bloodstains either manually or with the F.A.R.O. device. He agreed that the scan could tell the distances between the bloodstains and shell casings and the distances between the various shell casings. The "maximum point of error was five-hundredths of an inch." Sergeant Reddick admitted that he did not take such measurements in this case. He said: "I was mainly just looking at it to verify the five cartridge cases that were on the ground and at the evidence markers that had marked them."

Sergeant Reddick agreed that bloodstains could be used to show the direction from which shots were fired, and the distances between bloodstains could also be helpful in that regard. He further agreed that the shell casing found on Ms. Sindi's Infiniti could indicate that the vehicle was close when the shooting occurred. Sergeant Reddick asserted that no diagram of the scene included the location of the bloodstains because "it was presumed to be the victim's blood," and "we know where the location of the blood is, but we don't know if he was - - what happened here and he staggered to this point or he just fell. So, we can't guess." He was not aware of whether Johnny Lawrence had seen the F.A.R.O. scans.

Johnny Lawrence testified that he was asked by defense counsel to look at this case to determine if the witness's statements and the information from discovery fit what he saw in the crime scene. He further testified:

> Once I determined that, the blood was brought up and I was asked
> late if I could determine distances, and I - - there was no visible
> scales in the photographs available to where we could do that. So, I
> tried the best of my ability with what I had to get close to what the
> measurement of the stains was, to try to get distance. As far as the
> shell casings, they were measured in the diagram by the triangulation
> with lasers from each end of the K[]mart building, but none of the

- 15 -

bloodstains was triangulated in and therefore they [were] not even included in the diagram.

Mr. Lawrence felt that it was "critical" for a police officer to include the location of the shell casings and bloodstains in the diagram of a crime scene.

Mr. Lawrence looked at the photographs of the crime scene, which showed the markers of the shell casings and four bloodstains, to make his diagram of the crime scene. He testified:

> So, with the markers in the photographs and then the locations of the blood, and the positioning in the parking lot, I was able to put them in a general area, and that's all I was putting in. I was not saying the blood was exactly here. There's no way you can do that without the proper measurements of the bloodstain.

Mr. Lawrence asserted that the distances in the photographs between the shell casings and bloodstains were misleading because the photos were two-dimensional rather than three-dimensional. He said: "So you might be looking at something in the picture, and it only looks like it's three feet away, but it could be seven. You don't know without a scale." Mr. Lawrence testified that the four-foot scale used with the F.A.R.O. scans sometimes "looks like it's only a foot long" because "your eyes are not giving you the perfect picture."

When questioned by the trial court as to how he was able to get an accurate distance between the bloodstains and shell casings, Mr. Lawrence testified as follows:

> You can not get accurate. I could get approximate in the location, but there's no way to do accurate without some type of scale or previous[ ] measurements. You can't get accurate. On this particular case, I saw a shoe print with the scale after the fact, which was a ninety-degree shot. It was a (inaudible) scale. The shoe was about twice the size. So, the shoe should have been about a size eleven or twelve. Exact, I don't know, but I put that measurement on there, and then took that shoe print, and marked it and put it with my metric ruler. That's where we came up with that shoe print on the photograph equaled four millimeters on my ruler that I was comparing. So, I just did a walk-through, and I advised it's not accurate. It's not - - it's probably going to be ten, twelve feet difference, but it's a general location, but no one could take these photographs and get you an accurate reading of distance from one stain to another. Now, with the F.A.R.O., he got pretty close.

- 16 -

Mr. Lawrence testified that the two larger bloodstains were visible in the F.A.R.O. scans, and he was able to "get a measurement from Stain A to Stain B pretty accurate." He then measured the distance from both stains to the shell casings. Mr. Lawrence testified that he knew the last stain was perpendicular to Evidence Marker 3. He said: "So I know it's at least ten feet that way, but as far as accuracy, due to not having scales on the photographs, we lost that." Mr. Lawrence said that the F.A.R.O. scans were not available to him until a couple of weeks before the motion for new trial hearing.

Mr. Lawrence took Warren Fleak's diagram of the scene and added a car, the four locations of the blood, a circle around the shell casings, "along with the three texts with the arrows pointing to each of them." Mr. Lawrence then explained how he determined where to place each of the items that he added to Officer Fleak's diagram.

Trial counsel testified that he previously worked as a prosecutor and in private practice in Virginia before moving to Tennessee in 2009 or 2010, and he began practicing criminal defense law in 2013. He said that he participated as "second chair" in several murder cases while working as a prosecutor. Trial counsel agreed that his website stated that he had tried thousands of cases. He agreed that at the time Defendant's family hired him, he had not had any jury trials in Davidson County, and Defendant's case was his first murder trial while working as defense counsel. Trial counsel did not recall whether he and Defendant's family discussed hiring another attorney to sit as second chair. He agreed that the murder occurred on April 1, 2016, and Defendant's brother contacted him on April 2, 2016. Trial counsel was eventually retained to represent Defendant.

Trial counsel agreed that Defendant's brother had given him some information about Defendant's case, including the names of the individuals in both cars. Trial counsel identified his name on the visitation logs from the juvenile detention facility to see Defendant on two occasions. One visit lasted approximately fifteen minutes, and a second visit lasted fifty-eight minutes. Trial counsel did not visit Defendant after he was bound over for trial as an adult and transferred to a facility on Harding Road prior to posting bond. He charged a total of $35,000 to represent Defendant, but did not hire anyone to sit as second chair. Trial counsel agreed that when they met on June 13, 2016, Defendant provided him with a hand-drawn diagram of the locations of the cars at the scene on the night of the shooting, and they discussed what happened. On the diagram, Defendant identified Mr. Abdullah as the driver of the victim's car, he noted that there were four people in Mr. Abdullah's car and that the "gun guy" was sitting in the right rear passenger seat.

Trial counsel agreed that the State provided him with "lots" of discovery, and that he provided discovery to the State. This included social media posts from Mr. Abdullah and Mr. Kucher showing each of the men holding firearms. Trial counsel agreed that the State filed a motion in limine to prevent the images from being introduced at trial, and the trial court reserved a ruling on the motion until trial. He further agreed that he did not

attempt to cross-examine Mr. Kucher about the images after Mr. Kucher testified on direct examination that there were no guns in the victim's car at the time of the shooting. Trial counsel testified that he did not attempt to use the images under the theory that the State had opened the door for them to be used. He was aware that Tennessee Rule of Evidence 608 permitted impeachment of a witness with prior bad acts. He did not recall if he made a strategic decision not to question Mr. Kucher about the images of him holding firearms.

Trial counsel agreed that Hadar Sindi, Reybez Abdullah, Detective Shoesmith, and Awaz Mustafa testified at Defendant's juvenile transfer hearing. He said that Ms. Sindi drove the car in which Defendant was riding, and Mr. Abdullah was involved in a drug transaction with Ms. Sindi.

Trial counsel had Mr. Abdullah's and Mr Kucher's arrest records prior to trial. The State filed a motion in limine to prevent him from introducing the records. He did not recall why he did not attempt to use the records to impeach the two men at trial.

Trial counsel's investigator prepared a summary of the four witness's recorded police interviews, but each interview was not transcribed. He did not use any of the interviews to cross-examine the witnesses at trial. In particular, trial counsel did not use any of the statements Ms. Sindi gave during her police interview to impeach her on her assertion at trial that Defendant called her when phone records showed that she was actually the one who called Defendant about the drug deal. Trial counsel did not know why he did not cross-examine Ms. Sindi about the discrepancy.

Trial counsel testified that his trial notes indicated that he developed questions to ask the various witnesses, including potential defense witnesses. However, he never coached Defendant or conducted a trial simulation with Defendant. Trial counsel and Defendant discussed Defendant's testifying at trial, and he told Defendant that it was Defendant's decision. Trial counsel said that he and Defendant discussed the reason for Defendant being armed at the time of the shooting, but trial counsel did recall why Defendant had the gun. His notes indicated that Defendant said that he had been shot before and that he was scared. Trial counsel did not recall how many times he met with Defendant after Defendant was released on bond. Defendant's brother usually sat in the room during their conversations, and his brother also transported him to court.

Trial counsel agreed that the State asked for Mr. Lawrence to be excluded from the courtroom during trial and he should have objected when the trial court stated that it did not see any reason that Mr. Lawrence needed to be in the courtroom. He did not know why he agreed to exclude Mr. Lawrence when the Tennessee Rules of Evidence provide that an expert witness could be excluded from the Rule of Sequestration. Trial counsel acknowledged that he provided the State with a list of witnesses who had been subpoenaed even though it was not required.

- 18 -

Trial counsel acknowledged that he learned of the F.A.R.O. scans from the State, and the scans were also mentioned in the police reports. However, the State did not have the scans because they had not been processed. Trial counsel was advised that he would need to see Sergeant Reddick for the information. He admitted that he never contacted Sergeant Reddick about seeing the F.A.R.O. scans and that he only discussed it with Mr. Lawrence. Trial counsel testified that he should have asked for a continuance to obtain the F.A.R.O. scans. He asserted that distance was importance in this case because "[i]t determines that the deceased was the aggressor and he traveled all the way to the vehicle where [Defendant] was[,]" which was a "large distance."

Trial counsel agreed that the autopsy report indicated that the victim tested positive for marijuana. During trial following a hearing, the trial court took under advisement the issue of whether marijuana in the victim's system could be admitted at trial. Trial counsel did not know the reason that he never attempted to enter the evidence at trial. He was not aware that Mr. Abdullah was involved in a vehicular homicide two months prior to trial in this case.

On cross-examination, trial counsel testified that he hired a private investigator who met with Defendant several times while Defendant was in juvenile detention. He did not recall how much time the investigator had spent with Defendant, and he did not recall being unable to meet with Defendant any time that Defendant asked to meet. Trial counsel testified that he reviewed witness statements during his trial preparation, and he marked time stamps of specific statements. He and Defendant discussed the "defense many times" but he did not recall discussing a defense strategy based on Defendant's statement to police.

Trial counsel agreed that photos on social media of Mr. Abdullah holding a gun were not relevant after the State withdrew the attempted murder charge against Defendant in which Mr. Abdullah was also listed as the victim. He further agreed that Defendant never alleged that Mr. Abdullah tried to attack him, so he was not aware of any legal argument for admitting the photos. Trial counsel knew the State had similar photos from social media of Defendant with weapons, drugs, and money that could have been introduced if trial counsel had attempted to use the photos of Mr. Abdullah at trial. Trial counsel was unaware of any argument that he could have used to introduce Mr. Abdullah's criminal history at trial.

Trial counsel testified that he may not have focused on Ms. Sindi's phone records because she testified at trial that she initially contacted Defendant through Snapchat rather than a phone call. Trial counsel acknowledged that he did not continue arguing about Mr. Lawrence's presence in the courtroom after the trial court found there was no reason for Mr. Lawrence to be there. He said: "I normally don't keep arguing with the Court." Additionally, trial counsel acknowledged that the trial court ordered him to provide a list of defense witnesses and their statements to the State, and he followed the trial court's

- 19 -

order.  Trial counsel testified that he has not had any issues or arguments with Defendant's family since the trial.

On redirect examination, trial counsel agreed that he never saw any Snapchat communications between Defendant and Ms. Sindi.  He acknowledged that the trial court told him that if he used the victim's gang character and "stuff," he would be opening the door to proof of Defendant's character.  Trial counsel did not think that the trial court ruled that he would be opening any doors by introducing Mr. Abdullah's and Mr. Kucher's social media posts.  He agreed that Mr. Abdullah and Mr. Kucher testified that they did not have any guns at the scene; therefore, he did not make a tactical decision not to impeach them with the social media posts.  Trial court further agreed that the State's decision to dismiss the counts against any other individuals did not prohibit him from attempting to admit evidence against them.

On recross examination, trial counsel did not recall why he chose not to ask the trial court to introduce Mr. Abdullah's and Mr. Kucher's social media posts.  He said, "I just remember talking about it."  On redirect examination, trial counsel agreed that none of his trial notes mentioned the social media posts.

Upon questioning by the trial court, trial counsel testified that the defense strategy was that "the deceased was the aggressor."  He further said: "They pulled up.  [Defendant] didn't know.  The aggressor came out towards him, hit him in the face and he reacted irrationally and shot him."  Trial counsel agreed that in a communication to Mr. Lawrence, he said that the theory of the defense was "self-defense or voluntary manslaughter."  When asked by the trial court as to what evidence he anticipated at trial to establish the victim as the first aggressor, trial counsel testified:

> There was blood evidence that Johnny Lawrence testified that there was blood near - - the big pool of blood that was supposedly near the one car, and that there was a long distance between the other blood that was near the shells, the fact that the witnesses testified that the deceased punched  [Defendant] first and that he had traveled - - at least one witness testified that he had  - - was right behind the vehicle, I believe, when the - - when the - - when he got punched.

Trial counsel further testified that both the victim and Defendant were behind the vehicle, "which would indicate that the victim traveled further than Defendant."

Zana Ahmad, Defendant's brother, testified that Defendant turned himself in to police after hearing that there might be some retaliation for the victim's death.  Mr. Ahmad began trying to contact attorneys the following day, and trial counsel was the first to respond to his call.  He sent the following email to trial counsel:

It's my brother, [Defendant], went to K[]mart parking lot last night with two females to meet up with someone to buy weed. To his surprise, a guy named Aiad [("the victim")] that [Defendant] didn't get along with for a while now was cussing [Defendant] out and flashing his gun. [Defendant] was worried, and [the victim] and the other guys came toward my brother. He knew he was tricked and trapped. [The victim] punched [Defendant] while [Defendant's] attention [was] towards one of [the victim's] friends flashing another gun. [Defendant] started to unload his gun they didn't know he had out of sheer terror and ran away. I don't know how he got away. This is what I know.

Mr. Ahmad testified that Defendant was hysterical after the shooting, and their sister picked Defendant up on the side of the road and brought him home. He said that he took notes about Defendant and gave them to trial counsel.

Mr. Ahmad had personal knowledge of the dispute between Defendant and the victim, and he discussed the matter with trial counsel. He told trial counsel that the victim had "set up" Defendant to be beaten by Bejar Mustafa[4] approximately six months before the shooting. Mr. Ahmad testified that he gave the information to trial counsel.

Mr. Ahmad testified that his family hired trial counsel to represent Defendant at both the juvenile transfer hearing and a trial. He requested that trial counsel meet with Defendant while Defendant was incarcerated. After Defendant was released on bond, he accompanied Defendant to trial counsel's office because Defendant was on house arrest and did not have a vehicle. Mr. Ahmad attended every meeting between trial counsel and Defendant, which he estimated was six times. He said that Mr. Lawrence and Ms. Greer, the investigator, were also at some of the meetings. Mr. Ahmad testified that trial counsel was sometimes late for their meetings, and he would do other things before their meeting started which resulted in "like literally twenty minutes of our meeting would go by nothing being accomplished." According to Mr. Ahmad, trial counsel was five to ten minutes late for every court hearing. He noted that on one particular occasion, trial counsel was five hours late for court because he was involved in a case in another "far away" county.

Mr. Ahmad recalled some discussion about whether Defendant would testify at trial, and trial counsel told Defendant that it was Defendant's decision. When asked if he had any conversations with trial counsel about Defendant testifying, Mr. Ahmad said:

Well, one time, I remember, was right outside these doors right here during the trial. He said - - he asked the same thing to my brother, if he wanted to testify. And my brother said, you know, what do you

---

[4] Mr. Bejar Mustafa is no relation to Defendant.

think, and he was like it's up to you. And then, actually, there's another time I remember , which was the weekend before the whole trial even started. [Trial counsel] called me and he said, you know, what - - does your brother want to testify, and I'm like I don't know, what do you think, what should he do, and he was just like well, if he - - in case he does, you should just prep him.

Mr. Ahmad testified that Defendant "definitely" wanted to testify but was not confident in doing so because trial counsel "never said, hey you're going to testify and we need to get you ready." Mr. Ahmad said that he did not know how to prepare Defendant to testify.

Trial counsel never indicated to Mr. Ahmad that Defendant's case was his first murder trial, and he felt that trial counsel "absolutely" should have disclosed that information. He noted that trial counsel was paid $35,000 to represent Defendant. Trial counsel never mentioned hiring another attorney with more experience to help with Defendant's case, even though Defendant's family could have paid the additional cost. Mr. Ahmad testified that trial counsel seemed frustrated at times and did not know things, which trial counsel blamed on the district attorney's office. He said that trial counsel was at times also rude to him and his family.

On cross-examination, Mr. Ahmad agreed that there were other options for counsel, even though trial counsel was the first to respond to his call. He admitted that Defendant's family retained new counsel the week after trial. Mr. Ahmad also admitted that trial counsel never said that he had previously handled a murder case.

Mr. Ahmad testified that the victim and Defendant were close friends at one point, but Defendant felt that the victim had set Defendant up to be beaten. He knew that the victim had a problem with Defendant and had informed Bejar Mustafa of Defendant's location before the beating. He also knew that Defendant got beat up because of an argument between Defendant and Mr. Mustafa's sister.

Defendant testified that he was seventeen years old at the time of the offense, and he had been friends with the victim and had known the victim since elementary school. He also knew Mr. Abdullah and knew of Mr. Kucher prior to the shooting. On the night of the shooting, Defendant and Ms. Simic had been at his house using drugs. He was armed with a pistol, which he was "flashing" around on video through Snapchat. Defendant said that he had also been showing a large airsoft gun on social media that shot plastic BBs and looked like an AK-47. There were also videos on social media of him and Ms. Simic taking Xanax pills. Defendant testified that the purpose of all the videos was to portray himself as a "bad ass" even though he is generally fearful of people. He said that he carried a gun because he had previously been shot at and pistol whipped, and a gun made him feel safe.

Defendant testified that his issue with the victim began in August of 2015. He had been talking to a female, and they "bumped heads" and got into an argument. Defendant said that after arriving home that day, he received a call from the victim asking him to "hang out" at a hookah bar located near Nolensville Road. At the time, Defendant thought he and the victim were still friends. When Defendant got to the bar, Bejar Mustafa walked out with the victim behind him. Mustafa opened the car door and began beating Defendant, who was still fastened in the seatbelt, with a gun that Mr. Mustafa had pulled from his waistband. Defendant testified that the victim told him that he set him up. Defendant did not report the assault to the police out of fear of retaliation because the victim was a gang member.

Defendant testified that Ms. Sindi called him earlier on the day of the shooting and asked him to accompany her to buy some "weed" that she offered to smoke with him and Ms. Simic. Ms. Sindi later picked up him and Ms. Simic. While they were in the car, Ms. Sindi called Mr. Abdullah about buying the weed. Defendant said that he asked Ms. Sindi to find out who Mr. Abdullah was with, and she said that he was alone. He said that Ms. Sindi told Mr. Abdullah that Defendant was in the car with her.

Ms. Sindi drove to a bank and withdrew money from an ATM before driving to the Kmart parking lot. When they arrived, a silver Honda was parked in the parking lot, and Mr. Kucher, who was driving, flashed the headlights at them. Ms. Simic pulled up to the Honda, and the two cars were approximately two spaces apart driver's side to driver's side. Ms. Simic rolled her window down and began talking to the men in the other car. Defendant identified a drawing that he had previously made concerning everyone's location in the two vehicles. He said that once he realized that Mr. Kucher and the victim were in the Honda, he got anxious and sat back in the seat "real low" to avoid being seen.

Defendant testified that Ms. Sindi got out of her car and walked over to the Honda and conducted the drug transaction. When she walked back to her car and opened the door, causing the interior light to come on, he heard the individuals from the Honda say his name and they began threatening him. Defendant testified that he became uncomfortable and felt that he had to respond. He began "talking crap back to them," and after one particular comment, he said that Mr. Kucher and the victim both became aggressive and angry. Defendant testified that it appeared someone was trying to hold the victim back; however, he managed to get out of the car. Defendant saw the victim walk around to the front of Ms. Sindi's car, and Defendant felt the need to get out of her vehicle because he did not want to be beaten up again while trapped inside wearing the seatbelt. Defendant testified that Mr. Kucher also got out of the Honda, and Defendant and the victim "come face to face" behind Ms. Sindi's car. He said that Mr. Kucher walked a couple of steps from the driver's seat of the Honda and leaned against the hood, "just standing there."

Defendant testified:

So, as [the victim] is in my face, he's just getting really aggressive and angry. You know, he's saying all types of stuff, I'm ready to fight, what's up, what's good, what do you want to do, you know. So, I'm just standing there. I don't say a single word. I'm standing there with my hands to my side. And then, afterwards, Kamaran Kucher, he said something. I don't specifically remember what he said, but when he did speak, [the victim] looks back and looks at Kamaran Kucher, and I also put my attention to Kamaran Kucher. When I put my attention to him, he has a revolver, a black and silver revolver in his right hand, and he's just like lean - - like standing up sitting against the hood of the car with the gun in his right hand, and I see it. So, after we were - - my attention was on him, [the victim] notices that I still had my attention on Kamaran Kucher. When he realizes that I'm still - - I still have my attention on Kamaran Kucher with his big ole revolver in his hand, [the victim] turns around instantly and hits me really hard on the left side of my head right here. He hits me really hard, and I just started seeing stars. I just - - I got dazed. I got hit really hard. The last thing I had just seen was this big ole gun in Kamaran Kucher's hand. And so, what I felt like at the moment was, after I got hit, this guy could just walk up and just shoot me, execute me, whatever. So, after I get hit, and I'm thinking of what I'm going through and what I had just all witnessed, my first reaction was to just pull out my gun. It was placed in my - - on my right hip inside of my waistband in my gym shorts. I - - I pulled it out and . . . I - - I chambered a round, and I just started shooting. I just started shooting.

Defendant was "scared for [his] life" and shot at both the victim and Mr. Kucher. After the shooting, Defendant got back into Ms. Sindi's car, and he "just sat real low like [he] did before the altercation happened, and [he] told [Ms. Sindi] please drive off, get the hell out of here." Defendant testified that approximately five minutes later, Ms. Sindi told him to get out of the car.

Defendant originally told police that he ran from the scene and did not mention that Ms. Sindi drove him away. He said that he ran around for approximately an hour after he left the car, and he lost his gun and cell phone because he had them tucked inside the waistband of his gym shorts Defendant claimed that he did not intend to lose the gun since he was afraid that the victim and Mr. Kucher would find him. He later found his phone. Defendant contacted his sister, and she picked him up and eventually took him home. He called police because he was afraid of retaliation from the shooting, and he was taken to the police station to make a statement. He was then arrested and taken to juvenile court.

Defendant testified that trial counsel met with him for fifteen minutes one time and less than an hour the second time while Defendant was held in the juvenile court facility, and trial counsel never visited him while he was held in the adult facility. Defendant eventually made bond and visited trial counsel's office approximately six times with his brother. He told trial counsel what happened concerning the victim and Mr. Kucher and that there was a gun involved. He also told trial counsel about the previous assault by Bejar Mustafa. Defendant testified that they "didn't do much" during his visits with trial counsel, and he said that trial counsel would arrive late or be talking to his assistant while trying to gather up everything for Defendant's case.

Defendant testified that he and trial counsel one time discussed whether Defendant should testify at trial, and he asked trial counsel's opinion on the matter. He said that trial counsel only said that the decision was up to Defendant. Defendant claimed that he wanted to testify, but he was not prepared by trial counsel. He agreed that his new counsel had extensively prepared him to testify at the motion for new trial hearing. Defendant admitted that he waived his right to testify at trial, and he told the trial court that trial counsel had recommended that he not testify. He did not know that his case was trial counsel's first murder trial, and trial counsel never mentioned hiring co-counsel to help. Defendant agreed that his family had obtained Mr. Kucher's and Mr. Abdullah's social media posts, but trial counsel never used them.

On cross-examination, Defendant agreed that his previous drawing of the crime scene that he gave trial counsel was different than the drawing he gave present counsel for the motion for new trial hearing. He said that he told trial counsel the same story about what happened as he told present counsel. Defendant agreed that trial counsel met with him two times while he was in juvenile custody and five or six times after he was released on bond. He admitted that trial counsel's investigator met with him several times while he was in juvenile custody.

Defendant agreed that he did not initially give Bejar Mustafa's name as the person who beat him up and started Defendant's "beef" with the victim because the police never asked for the information. He said: "I didn't get into too much detail. I just gave them a rundown of what happened that night." Defendant testified that the victim admitted to setting him up for the beating, and that was the reason he and the victim did not like each other. Defendant could not recall if he was dating Bejar Mustafa's younger sister prior to the beating even though he told detectives during the interview that he had broken up with her and threatened to expose her online, which prompted Mr. Mustafa to get angry and beat him. Defendant said that he and Mr. Mustafa's sister got into an argument, "and that was the end of it."

Defendant denied taunting the victim prior to the shooting and said that the other individuals in the car with the victim were threatening Defendant. He said, "It was just I heard multiple voices from the other car saying my name and stuff. So, I just started talking

back to the guys in the other car." He said that he expected only Mr. Abdullah to be in the car that night. He did not expect the other individuals to be there. Defendant testified that he first thought that Mr. Abdullah was the driver of the victim's car rather than Mr. Kucher. He said that the victim and Mr. Kucher threatened to "whoop his a- - ." Defendant admitted that he did not tell police about the threat. He testified:

> I didn't give them  - - I didn't tell the detective the honest truth that night.  I was under the influence and I wasn't in the right state of mind to really speak with anybody, but I chose to and I tried to tell them, the best way that I could, what happened.

Defendant admitted that told detectives that he got out of the car to "box" the victim. He said that although he lied to detectives, the majority of his statement was true. When asked what he lied to detectives about, Defendant testified:

> I told detectives that I ran after the scene, but in actuality, I got back in the car.  I also lied about having the gun in the glove compartment when in fact it was on my person the whole time.  I can't remember everything, but it wasn't a lot of - - it wasn't all lies.  It's like I said, just at that time, I was trying my hardest to just get it all out so they would understand what just happened and what I just went through.

Defendant said that he was wrong about where the individuals were seated in the victim's car and reiterated that he did not tell the detectives about the victim threatening him. He asserted that he was not "purposefully trying to lie to the detectives.  It's just some things came out so fast and [he] was under the influence" and not in the "right state of mind."

Defendant testified that he told trial counsel that Mr. Abdullah was the driver of the victim's car because he assumed that Mr. Abdullah was the driver since he set up the drug deal.  Defendant claimed that he "accidently" told trial counsel that the other individual with the gun was seated behind the victim in the car because he tried to relate what happened "with all the information that I had that I could give him to my best ability." Defendant did not include Mr. Kucher's name on the drawing that he made for trial counsel on June 13, 2016, because he only knew Mr. Kucher as "Como." He admitted that on the drawing for present counsel, he showed Mr. Kucher as the driver of the victim's car and the person who pulled a weapon on Defendant.

On redirect examination, Defendant clarified that he originally thought Mr. Abdullah was the driver and that after reflection and multiple hearings, he realized that Mr. Kucher was the driver.  He said that the victim got out of the vehicle, and then Mr. Kucher got out with a gun.

Officer Charles Linville of the MNPD, crime scene investigation section, testified that he is trained in the use of a F.A.R.O. scanner. He explained that a F.A.R.O. scanner is a device that emits a laser that "is projected out and returns back to the unit, and it is - - has measurement capabilities to determine how far those items are from the scanner itself." Officer Linville agreed that the scanner had the capability to measure from a shell casing on the floor to a bloodstain on the wall. He said that the scans from the F.A.R.O. device are saved on an SD card and entered into a program that "will join multiple scans together" to calculate distances.

Officer Linville identified the diagram drawn by Officer Fleak and photographs taken at the scene of the shooting. He agreed that one of the photographs depicted a shadow of the tripod for the F.A.R.O. scanner. There were also pictures of evidence markers that corresponded to Officer Fleak's diagram. The diagram contained some measurements of the location of the shell casings in reference to a building. Officer Linville did not see any measurements between the shell casings listed on the diagram. He agreed that the F.A.R.O. scanner could have provided distances between the shell casings. Officer Linville identified blood spots in pictures of the crime scene. He testified that two scans were taken of the scene in the present case. He said that no special expertise is required to use the F.A.R.O. scanner and that anyone can go in and click on two different objects to obtain a measurement. Officer Linville then demonstrated the distances between bloodstains and shell casings in this case. He also identified measurements made by himself and present counsel between the various blood spots and shell casings. Officer Linville agreed that distances may become critical in a criminal case and that F.A.R.O. scans are done to have the measurements later on.

Officer Linville explained that F.A.R.O. scans are saved in "Webshare," and the District Attorney General's office has to request them. He agreed that at some point, the F.A.R.O. scans were requested in this case.

On cross-examination, Officer Linville agreed that the closer objects are to the F.A.R.O. scanner, the more accurate the distances between objects will be. He further agreed that if someone does not click in the correct place, especially with a longer distance, significant issues could be created. Officer Linville testified: "On this particular scene, if I was trying to document the bloodstains, I would have either added more scans or been closer to those." Officer Linville testified that distances between each shell casing are not typically taken. He said that based on his experience, he is not generally able to say where a shooter was standing based on the location of a shell casing. Officer Linville testified: "If there were some kind of ejection pattern test where you actually had a gun that was that gun, you could do that, but then there's a lot of different factors as far as casings bouncing and moving around."

Officer Linville testified that he was not trained in photogrammetry, and he was not aware of the MNPD providing training in such a program. He said that he could not use

the crime scene photographs and take a distance from one and extrapolate it into distances in another photograph. Officer Linville stated that the purpose of a diagram is to document the actual crime scene and the items there at the time. He said: "We would not put something in a diagram that was not physically there and we wouldn't replace an item in the scene to make a measurement[.]"

Johnny Lawrence was recalled as a witness and testified that he used the F.A.R.O. program and scans to determine various distances in this case, which he did not have at the time that he testified at trial. He also constructed a crime scene diagram from the scans. Mr. Lawrence agreed that there were two vehicles at the scene facing in opposite directions. He noted the general area on the diagram where the cars could have been located. Mr. Lawrence based his opinions on the location of the shell casings, the testimony of witnesses, the location of the "blood patterns," the laws of physics, and his training and experience.

Concerning the areas where the individuals involved in the shooting were standing at the time of the offense, Mr. Lawrence testified:

> You cannot exactly put them back in their spot because there's not enough evidence and corroborating evidence to go along with it, but you - - because of other evidence, casings, blood, you can put them near the area. These bloodstains here, as I testified in the trial, the big one is obvious. That's the one that had the pattern impressions, which appears to be shoes. As you go to the left, the three on the far left, that's where I first saw blood. That does not mean he was standing there when he was shot. Because of clothing, because of a hand covering the wound, you might not start dripping blood until you've walked a distance, and who knows how far that it. It's indefinite of how far you can go, but what I saw in the evidence that I got in the discovery was that was the first visible signs of blood that I saw in the photographs. As far as was he standing there, no one can say that.

Mr. Lawrence could not say for certain if the victim exited his car and walked around the vehicle to Defendant. "He would have had to have been at least around the area where the smallest [blood] spot is to the left. What I'm basing that off of is it was slightly west in the photographs of where Marker 4 was." Mr. Lawrence testified that the witnesses' statements were consistent with Defendant firing from the rear of Mr. Sindi's car and that the victim then traveled from the rear of Ms. Sindi's car to the right front passenger door of his own car. He said, "Where they actually started, no determination could ever be made, but I do know that's the first stain that was visible in the photographs. So that's what I have to start with." Mr. Lawrence could not say for certain exactly how far apart the cars were at the scene and exactly where Defendant and the victim were standing when

they first interacted. He said, "all I can say is where the first blood drop that hit the ground that I was able to observe."

Defendant was recalled to testify and identified documents containing his Snapchat communications on the day of the shooting and various other dates. He said that there were no Snapchat communications between him and Ms. Sindi on the day before or the day of the shooting. When asked if he was aware that messages can be deleted from Snapchat, Defendant replied: "I'm sure you can." He denied deleting any messages between him and Ms. Sindi. Defendant testified that Ms. Sindi called him shortly before the shooting, and he did not delete any of his phone messages.

## ANALYSIS

### I.    Sufficiency of the Evidence

Defendant contends that the evidence was insufficient to support his conviction for first-degree murder because "the elements of the offense were not proven beyond a reasonable doubt and thus reduce the grade of conviction to an offense which is supported by the evidence, such as manslaughter or some other grade of homicide." The State responds that the evidence presented was sufficient to sustain Defendant's conviction.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009) (citing *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see* Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (citing *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005); *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *Hanson*, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and

reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence. *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." *Wagner*, 382 S.W.3d at 297 (citing *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)).

First-degree murder is defined as "[a] premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." T.C.A. § 39-11-302(a).

> "[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

T.C.A. § 39-13-202(e).

The element of premeditation is a factual question to be decided by a jury from all the circumstances surrounding the killing. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). Although a jury may not engage in speculation, it may infer premeditation from the manner and circumstances of the killing. *Bland*, 958 S.W.2d at 660. Our supreme court has held that factors demonstrating the existence of premeditation include, but are not limited to, the following: the declaration of the intent to kill, the procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, the infliction of multiple wounds, the making of preparations before the killing for the purpose of concealing the crime, the destruction or secretion of evidence, and calmness immediately after the killing. *State v. Jackson*, 173 S.W.3d 401, 409 (Tenn. 2005); *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000). Additional factors cited by this court from which a jury may infer premeditation include lack of provocation by the victim and the defendant's failure to render aid to the victim. *See State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000). Further, "[e]stablishment of a motive for the killing is a factor from which the jury may infer premeditation." *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004) (citing *State v. Nesbit*, 978 S.W.2d 872, 898 (Tenn. 1998)).

A self-defense instruction was given in this case. In Tennessee, a person who is not engaged in unlawful activity may use deadly force in self-defense when that person has a reasonable belief, based upon reasonable grounds, that there is an imminent, real danger of death or serious bodily injury. T.C.A. § 39-11-611(b)(2). If the person was engaged in unlawful activity, there is a duty to retreat before using deadly force. *See State v. Perrier*, 536 S.W.3d 388, 394-401 (Tenn. 2017). It is well established, under Tennessee law, "that whether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact." *State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997) (citing *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993)).

We conclude that the evidence viewed in the light most favorable to the State proves that the killing in this case was premeditated. Defendant admitted that he had a "beef" with the victim who had previously set him up to be beaten by another man. The proof shows that the unarmed victim and Defendant began arguing, and the victim got out of his car and walked toward the front of the vehicle. Defendant also got out of Ms. Sindi's car armed with a gun. Mr. Kucher testified that at that point, the victim said, "What, are you gonna shoot me?" This was corroborated by other witnesses. The victim, who was smaller than Defendant, swung at Defendant, although there was some question as to whether the victim actually struck Defendant's face. At that point, Defendant fired multiple shots at the victim, even as the victim tried to turn away, striking him two or more times. Defendant did not attempt to render aid to the victim after shooting him multiple times, and he got into Ms. Sindi's car and instructed her to drive away. Defendant told her to stop at one point for him to discard his gun.

Although Defendant asserts that his conviction should be reduced to second-degree murder or manslaughter because the victim struck him first in the face, the jury, as was its prerogative, rejected any claim by Defendant of self-defense. At no point did Defendant, who was a juvenile in possession of a handgun and present at a drug transaction, attempt to retreat, and there was nothing to show that he faced an imminent, real danger of death or serious bodily injury. Although Defendant told police that he saw one of the victim's friends display a gun, there were no other witness who testified that they saw a weapon other than Defendant's. We conclude that a rational jury could have determined beyond a reasonable doubt that Defendant killed the victim intentionally and with premeditation. Therefore, the evidence is sufficient to support Defendant's first-degree murder conviction, and he is not entitled to relief on this issue.

## II.     Self-Defense Jury Instruction

Defendant argues that the trial court erred by failing to fully charge the jury as to the law concerning self-defense. He asserts that the instruction given by the trial court was deficient by failing to "include the fact that the defendant had no duty to retreat." The State responds that trial court properly charged the jury.

- 31 -

A defendant in a criminal case "has a right to a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000). A jury charge should contain no statement which is inaccurate, inapplicable, or which might tend to confuse the jury. *State v. Hatcher*, 310 S.W.3d 788, 812 (Tenn. 2010). A jury instruction is considered "prejudicially erroneous," only "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *State v. Hodges*, 994 S.W.2d 346, 352 (Tenn. 1997). Whether a jury instruction is required by the facts of a particular case is a mixed question of law and fact. *State v. Hawkins*, 406 S.W.3d 121, 128 (Tenn. 2013). The question of whether a jury instruction should have been given is therefore reviewed de novo with no presumption of correctness. *Id*.

At the time of the offense, Tennessee Code Annotated section 39-11-611(b)(1)-(2) provided that:

> (1)     Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.
>
> (2)     Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:
>
> > (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;
> >
> > (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and
> >
> > (C) The belief of danger is founded upon reasonable grounds.

T.C.A. § 39-11-611 (2014).

In *State v. Perrier*, 536 S.W.3d 388 (Tenn. 2017), our supreme court clarified that "the phrase 'not engaged in unlawful activity' is a condition on a person's statutory privilege not to retreat" rather than a complete bar to self-defense. *Id.* at 401. "[A] duty to retreat does not mean that a person cannot defend herself or himself." *Id.* at 404.

Consistent with the common law duty to retreat, a defendant engaged in unlawful activity "'must have employed all means in his power, consistent with his own safety, to avoid danger and avert the necessity of'" using force. *Id.* (quoting *State v. McCray*, 512 S.W.2d 263, 265 (Tenn. 1974)). The trial court must make a threshold determination of whether a defendant was "engaged in unlawful activity" as part of its decision whether to charge the jury with the no duty to retreat. *Id.* at 403. The court in *Perrier* declined to address the defendant's assertion that any unlawful activity must have a "causal nexus" to the perceived need to defend oneself.

However, in *State v. Tyshon Booker*, No. E2018-01439-CCA-R3-CD, 2020 WL 1697367 (Tenn. Crim. App. Apr. 8, 2020), *perm. app. granted* (Sept. 16, 2020) (order) (granting application for permission to appeal on the sole issue of whether sentencing a juvenile to life imprisonment is unconstitutional), a panel of this court held that "a causal nexus between a defendant's unlawful activity and his or her need to engage in self-defense is necessary before a trial court can instruct a jury that the defendant had a duty to retreat. *Id*. at *27. In *Tyshon Booker*, this court conceded that defendant's "status as a juvenile in possession of a handgun" could have been the "cause of the confrontation." *Id*. However, "status offenses such as this will rarely qualify as unlawful activity because a person's status alone cannot provoke, cause, or produce a situation." *Id*. Although in *Tyshon Booker*, this court rejected the use of defendant's status as a juvenile in possession of a handgun as the basis for unlawful activity, this court found that the evidence overwhelmingly established a causal connection, or nexus between defendant's robbing the victim and defendant's "perceived need to engage in self-defense." *Id*. Ultimately, this court concluded that defendant was engaged in unlawful activity at the time of the shooting and that he had a duty to retreat before engaging in self-defense. *Id*.

Here, the trial court found the defendant was engaged in unlawful activity at the time of the shooting before removing the "no duty to retreat" language from the self-defense jury instruction. In reaching this finding, the trial court said:

> I certainly find that [Defendant] was in possession of a weapon, there's no question about that, I don't think he's denying that he had a weapon. He admits it in his own statement, he admits that he fired it a number of times and as a juvenile, that is an unlawful activity; based on that alone, I think the no duty to retreat provision, it should be eliminated under [the] Perrier case that came out last week. And that's based on specifically where it says "we hold that a person is entitled to a jury instruction [that] he or she did not have to retreat from an alleged attack only when the person was not engaged in unlawful activity and was in a place the person had a right to be where he was, but he was also, there's no question that he was engaged in unlawful activity. I agree that it doesn't have to be a felony or misdemeanor, I don't think there's any distinction in that,

- 33 -

the term used is "unlawful activity," and as a juvenile, his carrying of a weapon is unlawful activity. They never reached in this case the causal connection.

The trial court further said: "But be that as it may, based on the acknowledgment that he, the defendant was in possession of the gun and was a minor at the time of the incident, Court finds that he was engaged in unlawful activity." In its order denying Defendant's motion for new trial, the trial court in considering this issue further pointed out that in addition to the unlawful act of carrying a weapon as a juvenile, "Defendant, along with all the parties present, was engaged in the unlawful conduct of a drug transaction." Therefore, the trial court removed the language in the self-defense instruction stating the defendant did not have a duty to retreat before using force.

In reviewing the record, we conclude the trial court correctly instructed the jury on this portion of the self-defense instruction and that a nexus existed between Defendant's unlawful activity and his perceived need to engage in self-defense. *See Tyshon Booker*, 2020 WL 1697367, at *27. It is undisputed that Ms. Sindi drove Defendant and Ms. Simic to the Kmart parking lot, and she purchased marijuana from Mr. Abdullah while the parties were present. Defendant knew that they were going to meet Mr. Abdullah to purchase the drug because he told police that Ms. Sindi had called and asked if he wanted to smoke marijuana. It is also undisputed that Defendant, who was a juvenile at the time of the shooting, had been smoking marijuana and brought a handgun with him to a drug transaction, and he used that handgun to kill the victim. Defendant told police that he had the weapon with him because he did not trust drug dealers since they were usually armed. He also said that he had the gun because a lot of people did not like him. Based upon this evidence, the trial court made a threshold determination that clear and convincing evidence existed to show that Defendant was engaged in unlawful activity at the time of the shooting. As a result, the trial court excluded the "no duty to retreat" language from the self-defense jury instruction, and nothing in the record supports the defendant's argument that the trial court's instruction on self-defense was erroneous for that reason.

The record is clear that the trial court provided a correct and complete charge of the law regarding self-defense as clear and convincing evidence exists to support the trial court's finding that Defendant was engaged in unlawful activity at the time of the shooting, and as such, the trial court correctly omitted the "no duty to retreat" language from the first portion of the jury instruction on self-defense. See *State v. Shannon Bruce Foster*, No. E2020-00304-CCA-R3-CD, 2021 WL 3087278, at *24 (Tenn. Crim. App. July 22, 2021) *no perm. app. filed*; *State v. Keontis Dontrell Cunningham*, No. M2020-00874-CCA-R3-CD, 2021 WL 3828418, at *8 (Tenn. Crim. App. Aug. 27, 2021), *no perm. app. filed*. Defendant is not entitled to relief on this issue.

### III. Disclosure of Witness Statements

Defendant contends that the trial court erred by requiring him to provide his witness's statements to the State at the close of the State's proof rather than immediately after those witnesses testified on direct examination. He argues that the trial court's ruling "directly impacts the ability of the defense to present a defense" and that he is not required to prove prejudice. The State asserts that the trial court did not abuse its discretion in requiring the statements to be provided in advance.

Rule 26.2 of the Tennessee Rules of Criminal Procedure, also known as Tennessee's version of the *Jencks Act*, states in pertinent part:

> After a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the witness, shall order the attorney for the state or the defendant and the defendant's attorney to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter of the witness's testimony.

Tenn. R. Crim. P. 26.2(a). The rule also defines a statement as: "(1) A written statement that the witness makes and signs, or otherwise adopts or approves; or (2) A substantially verbatim, contemporaneously recorded recital of the witness's oral statement that is contained in a stenographic, mechanical, electrical, or other recording or a transcription of such a statement." Tenn. R. Crim. P. 26.2(f)(1) & (2).

Pursuant to Rule 26.2, a party has no duty to provide the State with a copy of a witness's statement until after the witness has testified on direct examination. *State v. Caughron*, 855 S.W.2d 526, 535 (Tenn. 1993) (citing *State v. Taylor*, 771 S.W.2d 387, 394 (Tenn. 1989)). "The purpose of Rule 26.2 is to enable counsel to examine a witness's statements in order to test the credibility of that witness at trial." *Caughron,* 855 S.W.2d at 535. This court reviews a violation of Rule 26.2 for an abuse of discretion. *See State v. Gaston*, E2004-01450-CCA-R3-CD, 2006 WL 741, at *29 (Tenn. Crim. App. Jan. 13, 2006) (Trial court did not abuse its discretion when it denied the defendant's motion in limine requesting that he be given "early" *Jencks* material and when it refused to provide an instruction to the jury about when the State was required to provide *Jencks* material).

Our supreme court in *Caughron* stated:

> While neither state nor federal trial judges can require advance disclosure of statements, *U.S. v. Algie,* 667 F.2d 569 (6th Cir.1982) and *State v. Taylor, supra,* prosecutors should nevertheless avoid needless delay by following the State's example here. We would

strongly recommend early production of statements of witnesses in order to expedite the trial of the case and avoid lengthy recesses during trial.

*Caughron*, 855 S.W.2d at 535-36.

In this case, Defendant has not demonstrated or even argued how the trial court's requirement that he provide witness statements in advance impacted his ability to present a defense. As pointed out by the State, the trial court's requirement for Defendant to provide his witnesses' statements to the State at the close of the State's proof rather than immediately after those witnesses testified on direct examination comports with the public policy espoused in *Caughron* to avoid needless delay at trial. Additionally, if the trial court had adhered to the requirement of Rule 26.2 to provide the State with a copy of the witnesses' statements after they testified on direct examination, the State could have asked for a recess to review the statements. Therefore, the trial court did not abuse its discretion, and Defendant is not entitled to relief on this issue.

## IV.    Expert Witness Testimony

Defendant argues that the trial court denied him the constitutional right to present a defense by excluding testimony by his expert witness, Johnny Lawrence, as to the distances between various shell casings at the scene, blood spots, and other physical evidence left at the scene of the shooting. He asserts that the evidence, together with witness statements, "could be extrapolated by the expert to determine the probable location of various persons at the time of the shooting." Defendant argues that the distances could also establish who was the "first aggressor with the victim travel[ing] the further distance." The State contends that the trial court did not abuse its discretion in excluding the testimony and that Defendant fails to explain how the distances were material to his defense.

A defendant has "the right to present a defense[,] which includes the right to present witnesses favorable to the defense," under both the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment. *State v. Brown*, 29 S.W.3d 427, 432 (Tenn. 2000) (citing *Taylor v. Illinois*, 484 U.S. 400, 408 (1988); *Washington v. Texas*, 388 U.S. 14, 23 (1976); *Chambers v. Mississippi*, 410 U.S. 284, 302; *State v. Sheline*, 955 S.W.2d 42, 47 (Tenn. 1997)). However, in presenting a defense, the defendant must still comply with the rules of procedure and evidence. *State v. Flood*, 219 S.W.3d 307, 316 (Tenn. 2007) (citing *Chambers*, 410 U.S. at 302). "So long as the rules of procedure and evidence are not applied arbitrarily or disproportionately to defeat the purposes they are designed to serve, these rules do not violate a defendant's right to present a defense." *Id.* (internal citations omitted). "The facts of each case must be considered carefully to determine whether the constitutional right to present a defense has been violated by the exclusion of evidence." This court must consider whether: "(1) the excluded evidence is critical to the defense; (2)

the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important." *Brown*, 29 S.W.3d at 434-35 (citing *Chambers*, 410 U.S. at 298-301).

Expert testimony, like other evidence, must be relevant in order to be admissible. *See* Tenn. R. Evid. 402 ("Evidence which is not relevant is not admissible."). Relevant evidence is defined as any evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. This court reviews a trial court's decisions concerning the admissibility of expert evidence under an abuse of discretion standard, and will reverse a decision only "'when the trial court applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party.'" *State v. Parker,* 350 S.W.3d 883, 897 (Tenn. 2011) (quoting *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008)).

The admission of expert testimony is governed by Tennessee Rule of Evidence 702, which provides that "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. "The witness may acquire the necessary expertise through formal education or life experiences." *State v. Reid*, 91 S.W.3d 247, 302 (Tenn. 2002) (citing Neil P. Cohen et al., Tennessee Law of Evidence § 7.02[4] (4th ed.2000)). "However, the witness must have such superior skill, experience, training, education, or knowledge within the particular area that his or her degree of expertise is beyond the scope of common knowledge and experience of the average person." *Id*. The determining factor is "whether the witness's qualifications authorize him or her to give an informed opinion on the subject at issue." *State v. Stevens*, 78 S.W.3d 817, 834 (Tenn. 2002) (emphasis omitted).

In *McDaniel v. CSX Transportation, Inc.*, 955 S.W.2d 257 (Tenn. 1997), our supreme court recited several nonexclusive factors that a court may consider in determining the reliability of scientific testimony, including:

> (1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether . . . the evidence is generally accepted

in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation.

*Brown v. Crown Equipment Corp.*, 181 S.W.3d 268, 274 (Tenn. 2005) (quoting *McDaniel*, 955 S.W.2d at 265). Not all expert testimony will "fit" within these factors, thus the exact considerations that may be appropriate will vary depending upon "the nature of the issue, the witness's particular expertise, and the subject of the expert's testimony." *Brown,* 181 S.W.3d at 277. Our supreme court has stated, "Where the expert's testimony is otherwise reliable and experts in the field would reasonably rely upon such evidence, concerns are more properly addressed through vigorous cross-examination rather than exclusion of the testimony." *State v. Scott*, 275 S.W.3d 395, 409 (Tenn. 2009).

In denying Defendant's motion for new trial, the trial court in this case found:

> Defendant complains that the court unduly barred Mr. Johnny Lawrence from testifying as an accident reconstruction expert to show the positioning of the parties and the vehicles based on measurements between shell casings and blood spatters at the time of the shooting. The court disallowed the testimony because the court was not satisfied of the reliability of underlying data to support the opinions, not on the qualifications of Mr. Lawrence. The court felt that the opinions could mislead the jury since Mr. Lawrence himself said that he could not determine the location of defendant and the victim in relation to each other or the vehicles with any degree of scientific certainty based on the location of the shell casings.

The trial court properly excluded the testimony by Mr. Lawrence concerning his measurements between the shell casings and bloodstains, that were based on photographs of the crime scene, to determine where the victim and Defendant were located in relation to the vehicles at the time of the shooting. Mr. Lawrence admitted during the jury-out hearing that he did not have any scientific or reliable system in which to make such measurements. Upon questioning by the trial court, Mr. Lawrence agreed that he could not "tell th[e] jury anything about where the shooter was or where the person who was shot was standing in relation to [the] bloodstains[,]" or the location of either person when the bullets entered the victim's body. He testified that the only items left at the crime scene

when police arrived and the photographs were taken were the shell casings and bloodstains. Mr. Lawrence could only speculate as to where the vehicles and individuals would have been located at the time of the shooting. Therefore, we conclude that the trial court did not abuse its discretion in determining that Mr. Lawrence's expert testimony was not reliable enough to substantially assist the jury.

As to Defendant's contention that the trial court's exclusion of Mr. Lawrence's testimony prevented him from presenting a defense, Defendant has not shown that the testimony was critical to the defense or that it bears sufficient indicia of reliability. *Flood*, 219 S.W.3d at 316. As argued by the State, the distance that the victim may have traveled to reach Defendant before the shooting had little relevance to the theory of defense that the victim was the first aggressor and that Defendant shot the victim after the victim's friend cocked his gun. None of the witnesses testified that there was a fourth person in the victim's car or that anyone else at the scene had a gun before the shooting. All of the witnesses, including the ones who were with Defendant, testified that Defendant and the victim exchanged words, exited the vehicles, and were close enough to each other for the victim to swing at Defendant. It was clear from the testimony that the victim exited his car on the passenger side and walked around to the front of his car and to the back of Ms. Sindi's car. Defendant then fired multiple shots at the victim. Defendant was close enough to the back of Ms. Sindi's car for a shell casing to lodge into the trunk lid. The victim attempted to turn away as he was shot, and was then picked up by Mr. Kucher and Mr. Abdullah and put into his car and taken to the hospital. Therefore, Mr. Lawrence's testimony would not have added anything to the defense.

Furthermore, we have already determined that Mr. Lawrence's testimony did not bear sufficient indicia of reliability to substantially assist the jury. "Considering the importance a jury places on expert testimony and the need to place only reliable evidence before a jury so as to ensure accurate fact-finding, *see State v. Ballard*, 855 S.W.2d 557 561-62 (Tenn. 1993); *Chambers*, 410 U.S. at 302, this testimony was properly excluded." *State v. William R. Stevens*, No. M1999-02067-CCA-R3-DD, 2001 WL 579054, at 22 (Tenn. Crim. App. May 30, 2001). Defendant is not entitled to relief on this issue.

## V. Exclusion of Defense Expert During Trial

Defendant contends that Mr. Lawrence should have been allowed to sit at his table as an expert witness during trial and not have been subject to the Rule of Sequestration. The State argues that the trial court did not abuse its discretion.

A trial court has broad discretion in controlling the course and conduct of a trial. *State v. Davidson*, 509 S.W.3d 156, 193-94 (Tenn. 2016). This court reviews a trial court's

decisions for abuse of discretion. *Id.* A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases a decision on a clearly erroneous assessment of the evidence, or uses reasoning that causes an injustice to the complaining party. *State v. Davis*, 466 S.W.3d 49, 61 (Tenn. 2015). Tennessee Rule of Evidence 615, the so-called Rule of Sequestration, provides:

> At the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing. In the court's discretion, the requested sequestration may be effective before voir dire, but in any event shall be effective before opening statements. The court shall order all persons not to disclose by any means to excluded witnesses any live trial testimony or exhibits created in the courtroom by a witness. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) a person designated by counsel for a party that is not a natural person, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause. This rule does not forbid testimony of a witness called at the rebuttal stage of a hearing if, in the court's discretion, counsel is genuinely surprised and demonstrates a need for rebuttal testimony from an unsequestered witness.

The purpose of this rule "is to prevent a witness from changing or altering his or her testimony based on testimony heard or facts learned from other testifying witnesses." *State v. Bane*, 57 S.W.3d 411, 423 (Tenn. 2001). Furthermore, our supreme court has held that "allowing an expert witness to remain in the courtroom as an 'essential person' generally does not create the risk that the expert will alter or change factual testimony based on what is heard in the courtroom." *Id*.

In this case, the following exchange took place at a pretrial hearing concerning Mr. Lawrence:

> [Defense counsel]: Your Honor, I have one more matter. Johnny Lawrence who is an expert witness in our case and we ask that he be allowed to stay in the courtroom as an expert witness.
>
> [Prosecutor]: Judge, the only thing that Mr. Lawrence would be able to testify about is the blood spatter analysis, which that analysis should be an independent analysis based on the blood spatter. I don't see any reason why he should be allowed[ed] to be in the courtroom.

- 40 -

THE COURT:        I don't see any witness that's going to be testifying on the matter that he needs to hear and evaluate in order to respond to it.

[Defense counsel]:     Well, Your Honor, it was other issues about, well, one, he has been certified as an expert in crime scene investigation.

THE COURT:        I understand that, just because you're an expert, it doesn't automatically allow you to sit in through the trial.

[Defense counsel]:     I understand, I'm just asking, Your Honor. Because we were going to revisit some of the issues that he's now clarified for me, I think it would be helpful if there's testimony that's uncontroverted where the vehicles were and all that in relation to the blood spatter, he's be better able to make a determination in court as opposed – does that make sense, Your Honor?

[Prosecutor]:       Judge, the State objects to Mr. Lawrence making any determinations related to distances of items that were not included in the crime scene photos in [any] way, shape or form. And actually, I don't think that there's a basis for him to make any - - to testify to any determinations about distances because it's impossible for him to have made his own measurements.

[Defense counsel]:     Your Honor, if I could add to that, Your Honor; he didn't make his own measurements, he based it on measurements of the State that they actually placed a footprint with a ruler beside it and that's how he came up with the footage, the was using their measurements.

THE COURT:        Again, I don't see that he needs to be in the courtroom.

[Defense counsel]:     Okay, that's all right.

At that point, Defendant did not make any offer of proof concerning Mr. Lawrence's testimony. Because Defendant failed to make an offer of proof regarding the purpose of Mr. Lawrence's presence in the courtroom, "it is impossible for this court to determine whether the trial court erred by ordering that he could not remain in the courtroom as an essential witness." *State v. Carolyn Rhodes*, M2007-02083-CCA-R3-CD, at *6 (Tenn. Crim. App. Feb. 12, 2009). Furthermore, Defendant has not shown that he was prejudiced

as a result of Mr. Lawrence's exclusion from the courtroom. *Id.* As pointed out by the State, the only disputed issue at trial was whether Defendant shot the victim in self-defense. Defendant's statement to police was that he saw someone else with a gun pointed at him. He has not demonstrated that Mr. Lawrence's presence during the trial would have aided in his defense. Defendant is not entitled to relief on this issue.

## VI.    Limited Impeachment of Reybaz Abdullah

Defendant argues that the trial court erred by not allowing him to impeach Mr. Abdullah with questions concerning the grant of immunity by the State for his involvement in selling marijuana. The State responds that the issue is waived, and even assuming error, such error was harmless.

Tennessee Rule of Evidence 616 provides that a party "may offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness." The Advisory Commission Comment states, "[b]ias is an important ground for impeachment." "The right to explore or examine witnesses for bias is a fundamental right." *State v. Sayles*, 49 S.W.3d 275, 279 (Tenn. 2001). Furthermore, "[a]n undue restriction of this right may violate a defendant's right to confrontation under the Sixth Amendment of the United States Constitution and Article I, Section 9, of the Tennessee Constitution." *Id.* A trial court's decision will be upheld absent an abuse of discretion. *Id.*

The potential for bias exists "[i]f a witness has a pending criminal charge in the same jurisdiction in which he or she is testifying at trial ... [because] there is certainly possibility that the prosecutor's office is going to take favorable testimony into account when subsequently prosecuting the witness's pending charge." *State v. Eric James Taylor*, No. E2002–00966–CCA–R3–CD, 2003 WL 21542464, at *5 (Tenn. Crim. App. at Knoxville, July 9, 2003. Like other Confrontation Clause errors, a trial court's failure to allow a defendant to question a witness about his or her potential bias is a non-structural constitutional error. *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986); *Sayles*, 49 S.W.3d 275 at 280. Such errors do not require automatic reversal and are subject to harmless error analysis. *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008). "However, the burden on the State to demonstrate that a non-structural constitutional error is harmless remains quite stringent. The existence of a non-structural constitutional error requires reversal unless the State demonstrates beyond a reasonable doubt that the error is harmless." *Id.* The test to be applied is "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Id.* (quoting *State v. Allen*, 69 S.W.3d 181, 190 (Tenn. 2002)).

At a bench conference during Mr. Abdullah's cross-examination, the following exchange took place:

[Defense counsel]: I just want to mention this before I ask him the question, but during the hearing when he was asked of the drug transaction, [the prosecutor] said that he wouldn't be prosecuted for the dealing drugs, and I think that's appropriate to bring up, that he's been given immunity.

[Prosecutor]: Judge, we addressed this. Okay. Two separate things, he just said that I gave immunity for selling drugs, I didn't give him blatant immunity for selling drugs. During the hearing, after he got on the witness stand, I asked him "What were you guys doing in the parking lot," and he tells me exactly what he has said here today, he said he had marijuana, Hadar Sindi called him, he agreed to sell it to her, and that was something that he had not said before. And the Judge, she stopped the hearing and wanted to get him an attorney, because he had just admitted to a crime. So I told her, I said, Your Honor, I don't - - that won't be necessary, he's not been charged and he's not being prosecuted for the drug offense involved in this case. I didn't give him immunity. I clarified it with the Court. I never even talked to him about it. When he made the statement, he didn't [know that he] wasn't gonna get charged for selling drugs because I have never talked to him.

THE COURT: So you represented that after he had testified to it.

[Prosecutor]: After he said it. It's in the transcript.

[Defense counsel]: But the judge said - -

THE COURT: It really doesn't matter. First of all, he already admitted criminal wrongdoing before there was ever any issue about whether or not be could be prosecuted on the case, so it's really irrelevant, it has no probative value since he had already said it. Secondly, I have never known in the history of this county anyway, that someone admits to the police that they're selling drugs and the[n] got prosecuted for it without having the drugs or money or some corpus delecti of a crime admitted. I mean I can walk up to a police officer everyday of the week and say, "Hey, you know, I just sold drugs last night," and they will never prosecute them for it.

[Defense counsel]: They found drugs in the car.

THE COURT:    You can ask him if they found drugs in the car; did he ever get prosecuted for that.

[Defense counsel]:    Can I ask him if he's ever been prosecuted for selling drugs?

[Prosecutor]:    No.

THE COURT:    No. You can ask if they found drugs in his car on this occasion, and if so, did he ever get prosecuted for that, you can ask that, but no the immunity or, it would be use immunity anyway, what it sounds like, but it was after the fact, so I don't think its relevant.

The record does not reflect that Mr. Abdullah had any pending charges for selling marijuana or that he was granted any type of immunity for selling drugs. The trial court properly determined that Defendant could ask Mr. Abdullah about whether he was ever prosecuted for selling marijuana in this case, but Defendant failed to do so. Thus, we agree with the State that the issue is waived. *See* Tenn. R. App. P. 36(a) (providing that an appellate court need not grant relief where the complaining party failed to take reasonable available action to prevent or nullify an error). Furthermore, we agree that if there was error regarding this issue, any error was harmless beyond a reasonable doubt. The jury was aware that Mr. Abdullah was at the scene to sell marijuana to Ms. Sindi and had reason to question his credibility. However, his testimony was corroborated by all of the other witnesses, including Defendant's companions. Defendant is not entitled to relief on this issue.

## VII. Denial of Defendant's Motion for a Mistrial

Defendant argues that the trial court erred by failing to grant a mistrial when the State elicited testimony from his witness, Ryan Rhodes, that Mr. Rhodes had been out of town in treatment for his drug addiction prior to giving his statement to police. The State counters that there was no "manifest necessity for a mistrial," and the trial court gave the jury a curative instruction.

A trial court's decision to grant or deny a motion for mistrial is within the providence of that court. An appellate court will only disturb a trial court's ruling on the motion when there has been an abuse of discretion by the trial court. *State v. Nash*, 294 S.W.3d 541, 546 (Tenn. 2009). A trial court abuses its discretion when it "applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010).

A trial court should declare a mistrial "only when there is a 'manifest necessity.'" *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996) (quoting *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977)). "'In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did.'" *State v. Robinson*, 146 S.W.3d 469, 494 (Tenn. 2004) (quoting *State v. Land*, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000)). A mistrial should be declared "to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." *Williams*, 929 S.W.2d at 388. The defendant bears the burden of establishing that there was a manifest necessity for a mistrial. *Id.*

In this case, on cross-examination, Ryan Rhodes testified that he had just gotten back into town on the day that he was contacted by police concerning the shooting. On recross examination, Mr. Rhodes testified that he was out of town in treatment for his drug addiction. At that point, defense counsel objected and requested a mistrial. The trial court denied the request stating:

> I don't think the information is so prejudicial that the jury is necessarily going to throw out his entire testimony. His testimony is really, except for a few things, kind of generally corroborative of what happened on that night, other than direction of the gray car and possibly the number of shots, which he candidly admits he doesn't know how many shots there was.

The trial court then gave the following curative instruction to the jury:

> All right, members of the jury, just disregard that last question and answer about his being a recovering drug addict. It isn't relevant to the issues in this case unless he was using drugs on the night that he observed all of this, so just disregard it and don't consider that during the course of your deliberations.

The jury is presumed to follow the trial court's instruction. *State v. Robinson*, 146 S.W.3d 469, 494 (Tenn. 2004). "In order to overcome this presumption, an accused must show by clear and convincing evidence that such instruction was not followed." *State v. Vanzant*, 659 S.W.2d 816, 819 (Tenn. Crim. App. 1983); *see also State v. Cory Campbell*, No. W2005-01418-CCA-R3-CD, 2006 WL 3147050, at *6 (Tenn. Crim. App. Nov. 3, 2006). Moreover, Defendant has not demonstrated a manifest necessity for a mistrial. Mr. Rhodes' testimony was consistent with that of the other witnesses, except that he said the victim's car traveled in a direction away from Southern Hills Hospital after the shooting. However, he admitted that the car could have turned onto a side road to get to the hospital. We conclude that given the testimony of the other witness concerning the shooting, Mr. Rhodes' testimony that he was returning from treatment for his drug addiction the day that

police contacted him about the shooting did not cause the jury to discredit his statement and render an impartial verdict in this case. Defendant is not entitled to relief on this issue.

## VIII. Newly Discovered Evidence

Defendant argues that the developed 3D images of the F.A.R.O. scans constituted newly discovered evidence. The State counters that the scans were disclosed during discovery and thus are not newly discovered.

The decision as to whether to grant a motion for new trial on the basis of newly discovered evidence lies within the sound discretion of the trial court. *State v. Caldwell*, 977 S.W.2d 110, 117 (Tenn. Crim. App. 1997) (citing *Hawkins v. State*, 417 S.W.2d 774, 778 (Tenn. 1967)). A finding of an abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id.* When seeking a new trial based on newly discovered evidence, a defendant must show that neither he or she nor counsel had knowledge of the evidence prior to trial and that he or she and counsel exercised reasonable diligence in attempting to discover it during the trial, that the evidence is material, and that the evidence would likely change the result of the trial. *State v. Nichols*, 877 S.W.2d 722, 737 (Tenn. 1994); *State v. Caldwell*, 977 S.W.2d 110, 117 (Tenn. Crim. App. 1997).

After hearing the evidence at the motion for new trial hearing, the trial court made the following findings concerning this issue:

> Defendant complains that he was not provided by the State pretrial the contents of the FARO scans taken the night of the shooting which would more accurately establish various distances at the crime scene in support of the self-defense claim. In the alternative, Defendant claims that the scans were newly discovered evidence since they were not developed before trial. As to the latter, the court finds that the defense was aware that the FARO scanner had been used to create several 3-D images of the crime scene before trial. Therefore, the evidence cannot be considered "newly discovered."

The trial court further found:

> Despite rather lengthy testimony at the hearing regarding the FARO scans and defense claims that they were "exculpatory," no evidence was actually produced that showed the 3-D images from these scans would have shown the positions of the victim or the Defendant at the

- 46 -

time of the shooting were any different than those adduced at trial. Additionally, several exhibits from the hearing clearly show that the State was aware that the scans had been done and that they gave reports showing their existence to Defendant as well. In fact, trial counsel's own correspondence with his investigator makes mention of these scans. There has been no testimony or evidence showing these scans were either material or exculpatory.

We conclude that the trial court did not abuse its discretion in not granting Defendant a new trial. The scans are not newly discovered. As pointed out by the trial court, it was noted in discovery that the scans were taken even though images from the scans were not developed. Mr. Lawrence testified at trial during the jury-out hearing that the MNPD used a F.A.R.O. scanner in every homicide case, and he did not have time to request the scans in this case. Furthermore, the scans were not material to the case. Mr. Lawrence said that a F.A.R.O. scan was not necessarily the best evidence of distance in this case because it was dark at the crime scene, and he did not know where the F.A.R.O. scanner was set up. He acknowledged that even with the scans, he could not precisely determine where the victim, Defendant, and vehicles were located immediately before the shooting. Accordingly, Defendant is not entitled to relief on this issue.

## IX. Constitutionality of Defendant's Life Sentence

Defendant argues that his life sentence violates the United States and Tennessee constitutional due process and cruel and unusual punishment provisions. The State contends that this issue is waived, and in any event, Defendant's life sentence is constitutional.

Initially, as argued by the State, Defendant has failed to support his assertions with argument, authority, or citations to the record. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived."); Tenn. R. App. P. 27(a)(7).

Regardless of waiver, this issue is without merit. In *Miller v. Alabama*, the United States Supreme Court held that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'" 567 U.S. 460, 465 (2012). The Court did not prohibit a sentence of life without parole for all juveniles convicted of murder. *Id*. at 479. Rather, the trial court must consider "how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.*

Tennessee Code Annotated sections 39-13-202(b) and 39-13-207 state that a juvenile convicted of first-degree murder may be sentenced to either life or life without the

possibility of parole. In this case, Defendant was sentenced to life. This court has repeatedly declined to apply *Miller* outside the context of mandatory life without parole sentences. *See, e.g., Charles Hampton v. State*, No. W2019-01372-CCA-R3-PC, 2021-WL-274561, at * 16 (Tenn. Crim. App. Jan. 26, 2021) *no perm. app. filed* (Although Petitioner's life sentence may exceed his life expectancy, "we are bound by precedent on this issue.")*; State v. Steven King*, No. W2019-01796-CCAR3-CD, 2020 WL 5352154, at *2 (Tenn. Crim. App. Sept. 4, 2020) (declining to apply *Miller* to an aggregate sentence that "may push, and possibly exceed, the bounds of" that defendant's life expectancy because he was not sentenced to life without the possibility of parole), *perm. app. denied* (Tenn. Jan. 14, 2021); *Charles Everett Lowe-Kelly v. State*, No. M2015-00138-CCA-R3-PC, 2016 WL 742180, at *1 (Tenn. Crim. App. Feb. 24, 2016) (*Miller* did not apply to petitioner, who committed offenses as a minor, because he did not receive a life without parole sentence. Petitioner received two consecutive life sentences served concurrently with nine fifteen-year sentences). As pointed out by other panels of this court, "[i]n accordance with this jurisprudence, we are not prepared to expand the parameters of the Eighth Amendment in this regard." *State v. LaVonte Lamar Douglas*, No. W2020-01012-CCA-R3-CD, 2021 WL 4480904, at 24 (Tenn. Crim. App. Sept. 30, 2021), *no perm. app. filed*; *see also State v. Darious Fitzpatrick*, No. M2018-02178-CCA-R3-CD, 2021 WL 3876968, at *8 (Tenn. Crim. App. Aug. 8, 2021), *no perm. app. filed*; *Steven King*, 2020 WL 5352154, at *2. Defendant is not entitled to relief on this issue.

## X.     Ineffective Assistance of Counsel

Defendant raised numerous claims of ineffective assistance of counsel in his motion for new trial and on appeal. The State argues that the record supports the trial court's conclusion that none of the claims have merit.

Initially, we note that claims of ineffective assistance of counsel are generally more appropriately raised in a petition for post-conviction relief rather than on direct appeal. *See State v. Carruthers,* 35 S.W.3d 516, 551 (Tenn. 2000). This Court has consistently "warned defendants and their counsel of the dangers of raising the issue of ineffective assistance of trial counsel on direct appeal because of the significant amount of development and fact finding such an issue entails." *Kendricks v. State,* 13 S.W.3d 401, 405 (Tenn. Crim. App. 1999). Raising the issue of ineffective assistance of counsel on direct appeal is "a practice fraught with peril." *State v. Thompson,* 958 S.W.2d 156, 161 (Tenn. Crim. App. 1997). This peril is two-fold. First, ineffective assistance can rarely be established without an evidentiary hearing. *See Strickland v. Washington* 466 U.S. 668, 689–90, 694, (1984). Post-conviction procedures afford an evidentiary hearing to a Defendant with colorable claims. *See* T.C.A. §§ 40-30-109(a),-110. Second, raising the issue in the direct appeal could result not only in losing on appeal, but also in barring the claimant from raising the issue later in the post-conviction arena. T.C.A. §§ 40-30-106(f), (h). A post-conviction claim for ineffective assistance of counsel will be dismissed where that claim has previously been determined by another court. T.C.A. § 40-30-106(f). "A

ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing. A full and fair hearing has occurred where the petitioner is afforded the opportunity to call witnesses and otherwise present evidence, regardless of whether the petitioner actually introduced any evidence." T.C.A. § 40-30-106(h). However, because there is nothing barring a defendant from bringing an ineffectiveness claim in a direct appeal, we will proceed with our analysis of Defendant's claim.

Under Tennessee Code Annotated section 40-30-110(f), a defendant seeking post-conviction relief on the basis of ineffective assistance of counsel is required to prove his or her factual allegations "by clear and convincing evidence." This same standard applies even when the claim of ineffective assistance of counsel is raised on direct appeal. *State v. Burns,* 6 S.W.3d 453, 461 n. 5 (Tenn. 1999) (citing *State v. Anderson,* 835 S.W.2d 600, 607 (Tenn. Crim. App. 1992)). The factual findings are conclusive unless the defendant establishes that the evidence preponderates against those findings. *Fields v. State,* 40 S.W.3d 450, 457 (Tenn. 2001). For a defendant to successfully overturn a conviction based on ineffective assistance of counsel, the defendant must first establish that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose,* 523 S.W.2d 930, 936 (Tenn. 1975). Second, the defendant must show that the deficiencies "actually had an adverse effect on the defense." *Strickland,* 466 U.S. at 693. The defendant is not entitled to the benefit of hindsight; the defendant may not second-guess a reasonably based trial strategy; and the defendant may not criticize a sound, but unsuccessful, tactical decision made after adequate preparation for the case. *Adkins v. State,* 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *Cooper v. State,* 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

On appeal, this court reviews a trial court's findings of fact de novo with a presumption that those findings are correct, unless the record preponderates against the actual findings. *Fields,* 40 S.W.3d at 456-58. This Court may not reweigh the evidence or substitute its own inferences for those drawn by the trial court, and questions concerning the credibility of the witnesses, the weight and value to be given their testimony and any factual issues raised by the evidence are all for the trial court's determination. *Id.* at 456 (citing *Henley v. State,* 960 S.W.2d 572, 579 (Tenn. 1997)). This court's review of the trial court's conclusions of law is de novo, with no presumption of correctness. *Id.* at 457-58.

### A. Failure to Impeach Hadir Sindi with Phone Records

Defendant asserts the trial counsel was ineffective in this case for failing to impeach Ms. Sindi with cell phone records showing that she contacted Defendant prior to the shooting by phone rather than him contacting her via Snapchat as she testified to at trial. Defendant argues that the records show that no Snapchat communications were exchanged between him and Ms. Sindi on the day of the shooting.

- 49 -

Concerning this claim, the trial court concluded:

> Defendant additionally alleges trial counsel was ineffective for failing to impeach Ms. Sindi using telephone records to show who was the first to make contact with whom the night of April 1, 2016. As the evidence in the hearing showed, Ms. Sindi made contact with the parties involved via Snapchat that day as well as by telephone. There was also evidence presented that Snapchat communication listings can be deleted. Defendant has not shown exactly how Ms. Sindi would have been impeached using the telephone records alone. Even if defense counsel had established this inconsistency, defendant has failed to show how he was prejudiced by the inconsistency. There has been no showing of deficiency in this area.

The record does not preponderate against the trial court's findings. As pointed out by the State, impeaching Ms. Sindi with the telephone records would have had little impact on Defendant's self-defense argument. The trial court noted that "the eyewitness testimony in this case was not particularly complicated or inconsistent. In fact, it was fairly straight forward. And the forensic evidence was not complex at all." Regardless of who set up the drug deal, the evidence, including Defendant's statement to police, showed that Defendant and the victim did not expect to see each other at the Kmart parking lot and then began arguing when they saw each other. Contrary to Defendant's assertions, the State's theory was not that Defendant "solicited this drug transaction knowing the victim would be there so he could kill him." The State acknowledged in both its opening and closing arguments that the meeting between the victim and Defendant was coincidental and that Defendant armed himself once he realized that there was going to be a fight. It is undisputed that the victim and Defendant got out of their respective vehicles, and the victim approached Defendant and swung at him, possibly striking him in the face. Defendant then fired at least six shots at the victim striking him several times and then fled the scene. Defendant's statement to police was that the victim's friend had a gun and pointed it at him. However, none of the other witnesses, including Defendant's companions, saw a second person exit the victim's car or saw anyone else armed with a gun. Defendant has failed to carry his burden of establishing deficiency or prejudice and is not entitled to relief.

## B. Failure to Adequately Prepare for Trial

Defendant asserts that trial counsel rendered deficient performance by failing to adequately meet with him and by failing to advise him that this was trial counsel's first murder trial, "prohibiting him from acquiring a more experienced second chair." He further contends that trial counsel had too many other commitments to properly devote time to Defendant's case.

Concerning this issue, the post-conviction court found:

Defendant alleges that trial counsel had too many commitments to properly handle and investigate this case. In support of this claim, Defendant and his brother testified that defense counsel was always late for their meetings because he was busy handling other matters. However, there has been no evidence presented that there was additional information or evidence that was not uncovered due to trial counsel's work load. Trial counsel had one assistant investigator on staff to assist him with this case, and he hired another investigator/expert to assist him specifically with the evaluation and assessment of the crime scene and what might be gleaned from it.

Additionally, the eyewitness testimony in this case was not particularly complicated or inconsistent, In fact it was fairly straightforward. And the forensic evidence was not complex at all. For example, there was no fingerprint, DNA, tool mark or other scientific evidence that needed to be evaluated or analyzed in preparation for trial. The forensic evidence that did exist was primarily blood splatter evidence and shell casings none of which was particularly enlightening in establishing what happened that was not already known. The thrust of the State's case was the eyewitness testimony which was generally consistent and corroborative of each other. There has been no showing that trial counsel was either too over-worked or too inexperienced to adequately represent Defendant and address the evidence that was presented at the trial. This issue is also without merit.

The trial court further found:

Defendant alleges that trial counsel was ineffective because he did not hold the adequate number of meeting with Defendant prior to trial. The evidence shows that trial counsel and his investigator met with Defendant at least 4 times prior to his transfer from Juvenile Court. After Defendant was transferred, trial counsel filed a bond motion that secured Defendant's release from custody pending trial. Once Defendant was released he met with Defendant several times at his office, and discussed the evidence against him, defense strategies, and the pros and cons of him testifying. In addition, Defendant met independently with the investigator to discuss in detail the events of that night. Defendant has not shown any deficiency in this area.

- 51 -

The record does not preponderate against the trial court's findings. Trial counsel testified that he met with Defendant on two occasions while Defendant was in the juvenile detention facility, and his investigator also met with Defendant there. Trial counsel and his investigator also met with Defendant multiple times after Defendant was released on bond. Trial counsel testified that he reviewed witness statements during his trial preparation, and he marked time stamps of specific statements. Although trial counsel did not recall discussing a defense strategy based on Defendant's statement to police, he and Defendant discussed the "defense many times." As for trial counsel not disclosing to Defendant or Defendant's family that it was his first murder trial, trial counsel testified that he had previously worked as a prosecutor in Virginia before moving to Tennessee and that he participated as "second chair" in several murder cases while working as a prosecutor.

Defendant did not present any evidence regarding what additional meetings with trial counsel would have revealed, and he has made no showing that additional meetings or trial preparation or knowing that it was trial counsel's first murder trial while working as defense counsel would have led to a different result at trial. Additionally, Defendant did not present any evidence to show how hiring a second attorney to help trial counsel would have affected his defense. As pointed out by the trial court, trial counsel had an investigator and Mr. Lawrence helping with Defendant's case. Therefore, Defendant has failed to prove that trial counsel's performance was deficient or that he was prejudiced by the alleged deficiencies in counsel's representation concerning this claim.

## C. Failure to Prepare Defendant to Testify

Defendant argues that trial counsel rendered deficient performance by failing to adequately prepare him to testify at trial, "particularly given the nature of the defense of self-defense" and for failing to call him to testify at trial.

Concerning this claim, the trial court found:

> Defendant next claims that trial counsel was ineffective for failure to prepare Defendant to testify at trial and that he would not have been allowed to waive his right to testify. There is no denying that the right to testify is a fundamental one. However, the trial testimony here was that four eyewitnesses observed Defendant get out of his car and that he was the only one armed with a weapon. Furthermore, Defendant's testimony in the hearing on this motion was that he had been the victim of an assault that was, in his opinion, orchestrated by the victim. That could have further explained his fears and his reason to go armed, but it also could have provided the State with Defendant's motive for killing the victim. There is nothing to show that trial counsel's decision not to prepare Defendant to testify was not a legitimate strategic decision. Additionally, Defendant testified

- 52 -

at his *Momon* hearing that he understood that he had the right to testify, and he intelligently waived that right.

Again, the record does not preponderate against the trial court's findings. Trial counsel testified that he and Defendant discussed whether Defendant would testify, and he told Defendant that it was Defendant's decision. There was no testimony that Defendant told trial counsel that he wanted to testify or that trial counsel did not made a strategic decision in not recommending that Defendant testify. At the *Momon* colloquy, Defendant unequivocally agreed that he was voluntarily waiving his right to testify and that he had consulted with trial counsel regarding the decision whether or not to testify, and they discussed his defenses, the State's case, and the advantages and disadvantages of testifying. Therefore, Defendant has not shown deficient performance by trial counsel.

Moreover, Defendant has not established prejudice. As pointed out by the State, the jury heard Defendant's statement to police that he acted in self-defense and that there was another individual at the scene armed with a gun. He told police that Mr. Abdullah was driving the car, and he had trouble seeing the other gunman because Defendant was not wearing his glasses. Defendant also told them that there may have been five people in the victim's car, but he was sure that there were at least "four people for a fact." However, at the motion for new trial hearing, Defendant testified that he lied in his statement to police and that Mr. Kucher was actually the person who was armed and driving the victim's car and that there were only three people in the car rather than four or five. This testimony as to Mr. Kucher was contradicted by four other witnesses. Defendant's testimony would have further damaged his credibility with the jury. Additionally, as pointed out by the trial court, Defendant's testimony that he and the victim had a "beef" because the victim had set Defendant up to be beaten by Bejar Mustafa would have further provided the jury with a motive for Defendant to kill the victim. There was also the risk that if Defendant testified, the door could have been opened for his prior bad acts to be admitted. Defendant is not entitled to relief on this claim.

## D. Failure to Cross-Examine Witnesses About Prior Statements

Defendant asserts that trial counsel's performance was deficient because he did not transcribe the statements of the State's witnesses to use during cross-examination to impeach their testimony.

Concerning this issue, the trial court found:

> Defendant alleges that trial counsel was ineffective because, although he received the prior statement of witnesses, he did not review them himself nor did he have them transcribed. The evidence in the hearing showed that trial counsel had an assistant make summaries of the witness statements. It also showed that trial

counsel reviewed these summaries and made notes regarding the time stamps of various statements. It would have, of course, been the better practice to have the actual transcripts made of these statements. However, the trial record shows that trial counsel had knowledge of what the witness's prior statements had been, and he was able to effectively cross examine them at trial.

The record does not preponderate against the trial court's findings. Trial counsel agreed that his investigator prepared a summary of the State's four witness's recorded police interviews, but each interview was not fully transcribed. We agree with the State that the summaries were "fairly detailed" and included "time-code notations." Defendant did not call any of the witnesses to testify at the motion for new trial hearing to demonstrate how trial counsel should have used transcripts of the full interviews to improve his cross-examination of the four witnesses and impeach their testimony. Moreover, Defendant does not argue in his brief how the transcripts could have provided "more appropriate" cross-examination of the witnesses other than his assertion that the transcripts would have helped impeach Ms. Sindi to show that she first contacted Defendant about the drug deal rather than Defendant contacting her. However, we have already determined that this would have had little impact on Defendant's self-defense argument. Therefore, Defendant has failed to prove his factual allegations concerning this claim by clear and convincing evidence, and he is not entitled to relief.

### E. Failure to Impeach Mr. Abdullah and Mr. Kucher

Defendant argues that trial counsel was ineffective for failing to impeach Mr. Abdullah by establishing that he was "under active investigation by the MNPD for vehicular homicide." He further argues that trial counsel should have impeached both Mr. Abdullah and Mr. Kucher with various images posted on social media showing them in possession of "firearms and pistols and engaged in gang related activity."

Concerning this claim, the trial court found:

> Defendant asserts trial counsel was ineffective for failing to impeach witnesses Abdullah and Kucher with evidence of prior bad acts. Specifically he alleges that Mr. Abdullah's pending vehicular homicide charge and photographs and social media screenshots showing both witnesses in possession of weapons should have been used to refute their testimony that they were not in possession of weapons on the night of April 1, 2016.
>
> In his motion, Defendant has not cited any rule of law or evidence that would had allowed this evidence to be admitted. Tennessee Rule of Evidence 608 anticipates that specific instances of conduct

- 54 -

may be admitted to attack a witness's character for truthfulness. The fact that both witnesses may have previously been in possession of a weapon does not give rise to an inference that they had weapons on this night. To suggest that they did have weapons based on these social media screenshots would be mere speculation, particularly since none of the other eyewitnesses, including the [D]efendant suggested otherwise. Also, it is unclear how a vehicular homicide conviction, much less a pending charge as here, would be a relevant indicator of a person's character for truthfulness. This issue is without merit.

We agree with the trial court's findings. At the motion for new trial hearing, trial counsel testified that he had images from the social media posts and provided them to the State in discovery, and the State filed a motion in limine to prevent the images from being introduced at trial. The trial court ruled that none of the social media images were admissible unless one of the parties opened the door to make them admissible. Trial counsel agreed that he did not attempt to cross-examine Mr. Kucher about the images after Mr. Kucher testified on direct examination that there were no guns in the victim's car at the time of the shooting. Trial counsel further testified that he did not attempt to use the images under the theory that the State had opened the door for them to be used. He agreed that the photos of Mr. Abdullah holding a gun were not relevant after the State withdrew with attempted murder charge against Defendant in which Mr. Abdullah was listed as a victim. Trial counsel further agreed that Defendant never alleged that Mr. Abdullah tried to attack him, so he was not aware of any legal argument for admitting the images of Mr. Abdullah holding a gun. He was not aware that Mr. Abdullah was involved in a vehicular homicide two months prior to trial.

On appeal, as in his motion for new trial, Defendant cites to no rule of law or evidence that would have allowed Mr. Abdullah's pending vehicular homicide charge or the social media images to be admitted to impeach either Mr. Abdullah's or Mr. Kucher's credibility as to whether they were armed at the time of the shooting or how the door was opened at trial for admission of the images. There was no testimony that anyone other than Defendant was armed, and the witnesses testified that he and the victim were the only ones who got out of the cars. Although Defendant told police that there was another individual who had a gun, he did not tell police that it was Mr. Abdullah or Mr. Kucher. It was not until the motion for new trial hearing that Defendant asserted that Mr. Kucher was armed and got out of the victim's car. However, this was not corroborated by any other witness. Furthermore, Defendant failed to call either Mr. Abdullah or Mr. Kucher to testify at the motion for new trial hearing to demonstrate how the social media posts or Mr. Abdullah's pending investigation for vehicular homicide would have impeached their credibility. Therefore, Defendant has failed to establish his factual allegations regarding this claim by clear and convincing evidence and can show neither deficient performance or prejudice. He is not entitled to relief on this issue.

## F.  Ingestion of Marijuana by the Victim

Defendant asserts that trial counsel should have questioned the medical examiner about the marijuana detected in the victim's blood at the time of the autopsy.  During the pretrial hearing on this matter, the State opposed any reference to marijuana in the victim's system arguing that it was not relevant.  The trial court concluded that it "may or may not be admissible" depending on how much of the drug was present in the victim's system.

Concerning this claim, the trial court found that "[t]here has been no law or rule of evidence cited as to how this information would have been admissible."  Likewise, in his brief, Defendant has not cited any law or rule of evidence to support his claim.  He did not call Dr. Deering to testify at the motion for new trial hearing, and he did not present any other evidence at the motion for new trial hearing concerning the amount of marijuana in the victim's system or its effect on the victim, other than a copy of the medical examiner's report that was introduced as an exhibit at the hearing indicating the amount of marijuana present.  Therefore, Defendant cannot show deficient performance by trial counsel or that he was prejudiced by trial counsel's performance.  Defendant is not entitled to relief on this issue.

## G.  Providing the Defense Witness List to the State

Defendant argues that trial counsel was deficient by providing the State with a list of witnesses, although not required by law, "because this would alert the State as to what witnesses would be called and allow for development of impeachment proof."

Concerning this issue, the trial court found:

> Defendant has asserted that trial counsel's representation was deficient in that he supplied a witness list to the State prior to trial despite this not being required by law.  In support of this allegation, he cites *Bray v. State*, 450 S.W.2[d] 786 (Tenn. Crim. App. 1969). Unfortunately, Defendant's argument is misplaced.  The holding of *Bray* was that it was error for the trial court to require a defendant to provide a list prior to trial and "be irrevocably bound to use only those so identified." *Id*. at 787.  There is no prohibition against the defense providing a witness list prior to trial, and in this case, Defendant was not prohibited from adding additional witnesses after the list was provided.  In any case, Defendant has not made the slightest allegation as to how the State receiving the witness list prior to trial prejudiced him.  This issue is also without merit.

- 56 -

We agree with the trial court's findings. Additionally, we note that trial counsel acknowledged at the motion for new trial hearing that the trial court ordered him to provide a list of defense witnesses and their statements to the State, and he followed the trial court's order. Defendant cannot show that trial counsel's performance was deficient by complying with the trial court's order. Defendant is not entitled to relief on this claim.

### H. Failure to Object to the Exclusion of Mr. Lawrence During Trial

Defendant argues that the trial counsel rendered deficient performance by agreeing that Mr. Lawrence could be excluded from the courtroom "contrary to Tennessee Rule of Evidence 615."

Concerning this issue, the trial court made the following finding:

> Defendant alleges that trial counsel was deficient in failing to object to the court's exclusion of his expert, Mr. Lawrence from the courtroom during trial testimony. In fact, it was elucidated from trial counsel at [the] hearing that he had, in fact, objected, and he had been overruled by the court.

Again, we agree with the trial court's finding. At the motion for new trial hearing, trial counsel agreed that he did not continue arguing about Mr. Lawrence's presence in the courtroom after the trial court ruled that there was no reason for Mr. Lawrence to be in the courtroom. Trial counsel said: "I normally don't keep arguing with the Court." Defendant has not demonstrated that trial counsel was deficient concerning this claim. Trial counsel requested that Mr. Lawrence be allowed to remain in the courtroom during trial as an expert witness. During a discussion with trial counsel and the prosecutor, the trial court noted: "I don't see any witness that's going to be testifying on the matter that he needs to hear and evaluate in order to respond to it." The trial court concluded that it did not "see that he needs to be in the courtroom." Trial counsel then responded: "Okay, that's all right." Trial counsel's performance cannot be seen as deficient in abiding by the trial court's ruling.

Furthermore, Defendant has not shown any prejudice. He has not demonstrated that Mr. Lawrence's presence in the courtroom was essential to his defense. As discussed above, the only disputed issue at trial was whether Defendant shot the victim in self-defense. All of the witnesses testified that Defendant and the victim began arguing, that they were close enough that the victim swung at Defendant first, and that Defendant shot the victim multiple times. The distance that the victim may have traveled around the two cars parked side by side to reach Defendant does not refute those facts and would not have affected the verdict in this case. Defendant is not entitled to relief on this claim.

### I. Failure to Use the F.A.R.O. Scans at Trial

Defendant contends that trial counsel was ineffective for failing to request that the F.A.R.O. scans be developed and used "for impeachment or for use by the defense crime scene analysis for potential exculpatory value."

In addressing the F.A.R.O. scans as a direct appeal issue, the trial court concluded that there was nothing to suggest that the F.A.R.O. scan images would alter or refute the evidence that the victim struck Defendant in the face despite knowing that Defendant was armed with a gun and that Defendant fired shots at the victim from a fairly close range. In addressing the issue in the post-conviction context, the trial court found:

> Defendant has alleged throughout the hearing and motions that the FARO scans were not provided to defense or to his expert prior to trial. His expert, Mr. Lawrence, testified at the hearing in November that even after being provided with the information from the scans he could not have stated with any finality the positions of the victim or Defendant when the shooting occurred. Defendant has failed to show deficiency in trial counsel's performance in not providing documents that seem [to have] nominal material value to the case in light of the eyewitness testimony addressing the same subject matter. Additionally, he has not shown how he was prejudiced by these materials not being examined prior to trial. Defendant is not entitled to relief on this issue.

The record does not preponderate against the trial court's findings. Trial counsel admitted at the motion for new trial hearing that he learned of the F.A.R.O. scans from the State, and they were mentioned in the police reports. Trial counsel was advised that he would need to contact Sergeant Reddick about getting the scans processed but he never made the request. He asserted that he should have requested a continuance to obtain the scans since distance in this case was important because "[i]t determines that the deceased was the aggressor and he traveled all the way to the vehicle where [Defendant] was[,]" which was a "large distance."

Despite trial counsel's assertion that he should have requested the scans, we do not find that he rendered ineffective assistance of counsel. The scans do not contain any additional information that was not available in the photographs taken at the crime scene. The only items still at the scene when the scans were taken were shell casings and bloodstains. There was nothing to show where the vehicles or individuals were located at the time of the shooting. As pointed out by the State, trial counsel attempted to introduce evidence through Mr. Lawrence of the distance that the victim traveled to reach Defendant to show that the victim was the first aggressor; however, the trial court limited Mr. Lawrence's testimony because he agreed that he could not precisely reconstruct the crime scene and that his measurements were not based on anything scientific. Mr. Lawrence

testified in the jury-out hearing at trial that a F.A.R.O. scan was not necessarily the best evidence of distance in this case because it was dark at the crime scene, and he did not know where the F.A.R.O. scanner was set up. Therefore, Defendant has not shown that trial counsel was deficient for failing to request the scans.

Additionally, Defendant has not shown that he suffered prejudice by trial counsel's failure to request that the scans be processed. Defendant has not shown that Mr. Lawrence would have been able to testify concerning the F.A.R.O. scans at trial since the trial court excluded his testimony concerning his reconstruction of the crime scene from the photographs. According to Mr. Lawrence's testimony, he could not precisely reconstruct the crime scene with or without the scans because the vehicles and individuals were not present when the scans were taken. Furthermore, as we have already concluded, it was undisputed that the victim struck the first blow, and Defendant shot the victim multiple times. Defendant's statement to police and his testimony at the motion for new trial hearing was that he panicked and began shooting because someone else at the scene had a gun. This claim was not supported by any of the other testimony at trial. The distance that the victim traveled around the car to reach Defendant is not relevant to this claim of self-defense. Defendant is not entitled to relief.

## J. Strategic Decisions

Defendant asserts that trial counsel never testified that "his decisions were based on well-grounded strategic decisions" and adequate preparation. In support of this claim, Defendant reiterates his arguments concerning several of the ineffective assistance of counsel claims raised above and fully addressed by this court. Although trial counsel did not specifically testify that he made strategic decisions concerning the issues raised, this does not negate our findings that trial counsel rendered effective assistance to Defendant at trial and that Defendant has not demonstrated that he suffered any prejudice by trial counsel's alleged deficiencies. We note that Defendant further argues "that the deficiencies of trial counsel cumulatively resulted in effective assistance" and that the "reliability of the verdict is in question." However, this claim is addressed below in our findings concerning cumulative error.

## XI. Cumulative Error

Defendant contends that he is entitled to a new trial because the cumulative effect of errors denied him a fair trial. The State counters that the trial court properly ruled on Defendant's direct appeal issues, and none of trial counsel's actions amounted to deficient performance nor did any of Defendant's direct appeal or post-conviction issues result in prejudice, therefore he is not entitled to cumulative error relief.

Our supreme court has stated:

The United States Constitution protects a criminal defendant's right to a fair trial; it does not guarantee him or her a perfect trial. We have reached the same conclusion with regard to the Constitution of Tennessee. It is the protection of the right to a fair trial that drives the existence of and application of the cumulative error doctrine in the context of criminal proceedings. However, circumstances warranting the application of the cumulative error doctrine to reverse a conviction or sentence remain rare.

The cumulative error doctrine is a judicial recognition that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial.

*State v. Hester*, 324 S.W.3d 1, 76-77 (Tenn. 2010) (citations omitted).

To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings. *State v. Herron*, 461 S.W.3d 890, 910 (Tenn. 2015) (citing *Hester*, 324 S.W.3d at 77). After considering each of Defendant's issues on appeal and finding only one error that was harmless, we need not consider the cumulative effect of any alleged errors.

In the post-conviction context, "a petitioner cannot successfully claim he was prejudiced by trial counsel's cumulative error when the petitioner failed to show trial counsel's performance was deficient." *Thomas Edward Clardy v. State,* No. M2017-01193-CCA-R3-PC, 2019 WL 5046032 at *7 (Tenn. Crim. App. Oct. 17, 2018) (citing *James Allen Gooch v. State,* No. M2014-00454-CCA-R3-PC, 2015 WL 498724 at *10 (Tenn. Crim. App. Feb. 4, 2015). Because we have concluded that trial counsel's performance was not deficient and that there is no error in the judgment of the trial court, there is no aggregate effect, and Defendant was not deprived of his right to a fair trial. Defendant is not entitled to relief on this issue.

## CONCLUSION

Based on foregoing analysis, we affirm the judgments of the trial court.

_____
JILL BARTEE AYERS, JUDGE